Argued June 24, reversed and remanded September 23, rehearing denied November 25, 1919.

## ANDERSON v. COLUMBIA CONTRACT CO.*

(184 Pac. 240; 185 Pac. 231.)

**Fish—Whether Destruction of Fish-traps by Tugboat was Negligence for Jury.**

1. In an action by the owner of a fish-trap against the owner of a barge for damages resulting to the trap, the questions whether or not the defendant negligently failed to maintain sufficient lights, to keep a lookout, or to see and avoid the trap, or operated the flotilla at a dangerous speed, or negligently failed to stop the tugboat and her tow and avoid the fish-trap, were properly for the jury.

**Navigable Waters—Columbia River is a Navigable Stream.**

2. The Columbia River is a navigable stream, and as such is a common highway "and forever free," and the right of navigation therein is not only given by the common law, but is preserved by the statute admitting the state of Oregon into the Union.

**Fish—Paramountcy of Right of Navigation Does not Extinguish Common Right of Fishery.**

3. The paramountcy of the right of navigation does not extinguish the common right of fishery, although the former does, whenever there is a necessary conflict, limit the latter and compel it to yield, so far as the right of fishery interferes with the fair, useful, and legitimate exercise of navigation rights, but the navigator must use ordinary care and due regard to property rights of fishermen.

   [As to the right to fish in navigable waters, see note in 21 Ann. Cas. 777.]

---

*Authorities discussing the question of right to construct fish-traps in front of riparian property are collated in a note in L. R. A. 1918A, 1076.                                                                        REPORTER.

Navigable Waters—Unauthorized Obstruction to Navigation Does not Permit Its Negligent Destruction.

4. The public is entitled to navigate upon any part of the navigable waters of a stream without unlawful obstructions, and an obstruction erected under grant of authority beyond the limits of the orders of authorization is unlawful, and a nuisance only to the extent the authority was exceeded, and that it is wholly or partly unauthorized does not necessarily give a navigator authority to destroy it negligently.

Trial—Instruction Omitting Reference to Negligence Cured by Subsequent Instruction.

5. In an action for destruction of a fish-trap by a tug, an instruction as to defendant's negligence that "it is charged" "that the boat was being operated outside of and beyond the channel or course in which vessel should be operated," while insufficient, when standing alone, for omission to allege "negligently operated," the error was cured by another instruction covering negligent operation.

Fish—Whether Destruction of Fish-trap by Tugboat was by Negligent Navigation Question for Jury.

6. In an action for the negligent destruction of a fish-trap by a tugboat, an instruction that it was the "duty of defendant to operate and navigate said vessel in the channel or usual course in which vessels navigating said river should be operated and navigated" held erroneous, since it was not negligence per se to operate the boat outside of the usual course followed by vessels; the matter being a question of fact for the jury.

Fish—Evidence Sufficient to Show Authorized Construction of Fish-trap.

7. Where plaintiff, in an action for damages for injuries resulting from his fish-trap being struck by defendant's tugboat, was authorized by both the State of Washington and the United States to erect and maintain the trap, evidence held to show that a part, if not all, of the portion of the trap injured or destroyed was erected in accordance with such permits and was a legal obstruction.

Courts—Action for Destruction of Fish-trap Maintainable in State Other Than Where Located.

8. Where no part of a fish-trap was driven into the earth, except piling, all of which was driven by the owner with the intention of removing at the end of the season, the trap was "personal property," and an action against the owners of a tugboat for its destruction was transitory, and could be maintained in a state other than where the trap was located.

Damages—Evidence of Daily Catch Admissible in Action for Destruction of Fish-trap.

9. In an action against the owner of a tugboat for destruction of plaintiff's fish-trap, although such trap may not have "rental value," in the usual sense of the term, yet it has a usable value, which plaintiff would be entitled to recover, and evidence as to the amount of the fish catch just prior to injury or destruction and just

after repair, together with evidence of the catch of other near-by traps between such times, was competent evidence, not for the purpose of measuring the compensation, but for estimating the usable or rental value.

### PETITION FOR REHEARING.

**Trial—Instruction—Cure of Error by Other Instruction.**

10. A party cannot claim that an erroneous instruction was not prejudicial because another instruction correctly stated the law, where the erroneous instruction stood out as boldly and prominently as the proper instruction.

From Multnomah: CALVIN U. GANTENBEIN, Judge.

Department 1.

The Columbia Contract Company, an Oregon corporation having its principal office in Portland, appealed from a judgment for $1,050 which Peter Anderson obtained against it, for damages done to his fish-trap by the company's towboat and barges. Anderson owned a pound net fish-trap on the Washington side of the Columbia River. The waters of the river are affected by the ebb and flow of the ocean tides at the place where the trap is located. The fish-trap was constructed by driving piling into the bed of the river and attaching web or nets to the piling in the manner described in *Monroe* v. *Withycombe*, 84 Or. 328, 331 (165 Pac. 227). The extreme width of the heart of the Anderson trap was approximately 50 feet; the lead was about 350 feet long with the piling in it set from 8 to 10 feet apart; and hence the trap was about 400 feet over all.

About 300 feet above the Anderson trap and on the Washington shore of the river was a light and back farther "up in the woods" was a second light. These two lights are known in the record as the range lights. On the Oregon side of the river and above the Anderson trap is a place called Bugby Hole where another light is kept; and between Bugby Hole and the Ander-

son trap is a bar in the river, called Puget Bar.    Upon leaving Bugby Hole, masters of vessels navigate Puget Bar by getting in line with the two range lights and steer on that course until the bar is crossed.

Along the entire length of the Anderson trap the water is about 17 feet in depth except at the "inner end" where it is "about 8 or 10 feet." About 1,800 feet above the Anderson trap on the Washington side of the river is another trap known as the Brandt trap. There is no obstruction between these two traps. Referring to the towboat and barges operated by the defendant, one witness stated that there "was water enough" between the two traps "so that you could go pretty close by the shore."

We cannot speak any more definitely of the width of the river at the place where the Anderson trap is located than to say that it is between 2,000 feet and one mile. Puget Bar ends at a point above the Anderson trap. According to the testimony of one witness for the plaintiff "after you get across the bar, and down the river, the whole river is deep and you can go anywhere." Another witness for Anderson stated that "it is deep water clear across" opposite the Anderson trap. J. O. Church, who was employed by the defendant as master of the towboat "Samson" and was thoroughly familiar with the presence and location of the Anderson trap, explained that if it be assumed that the river is 2,000 feet wide at the Anderson trap "you will probably have 500 feet there" beyond the outside end of the trap to "navigate in." The plaintiff contended that there "is three or four thousand feet of channel there—deep water across the channel."

The witnesses differed in their opinions as to how far vessels usually ran outside the Anderson trap when

passing up or down the river. The estimates given by the witnesses for the plaintiff range from 800 to 1,000 feet. Captain Church, a witness for the defendant testified: "I should judge the steamships ran in within 250 feet." J. E. Copeland, a master of steamboats with many years of experience, stated that the course usually followed by him before the trap was put in ran about 20 feet from it; but after the trap was installed he made a change in his course by changing one eighth of a point in the distance from Puget Bar to the range light and this changed course passed the end of the trap at a distance of about 200 feet.

The Columbia Contract Company was engaged in transporting rock down the river to the jetty at the mouth of the river and for that purpose the company used three barges and a towboat called the "Samson." Each barge when loaded carried about 800 tons of rock and drew about 10 feet of water. The "Samson" drew between 14 and 14½ feet of water. Each of the barges was about 140 feet long and approximately 40 feet wide. The "Samson" was about 125 feet long with a 25 foot beam. At some time in 1911, probably September 28th, the defendant was taking the "Samson" and three barges loaded with rock down the river. One barge was lashed to the bow of the "Samson" while a second barge was lashed on one side and the third barge was lashed on the other side of the first barge and towboat, making of the towboat and barges, what counsel have termed in their briefs, a "spike formation." The flotilla was approximately 120 feet wide. The "Samson" with its barges passed Bugby Hole about 3 A. M. and at that time it was so foggy that the range lights above the Anderson trap could not be seen. The fog made its appearance on the river about midnight and in a short time became so thick

that the range lights were completely obscured from view and could not be seen by fishermen on the river. One fisherman, Christian Tholo, was operating a gill-net in the channel of the river a short distance above the Anderson trap and upon hearing the fog signal of the "Samson" he took in his net. He could not see the range lights; nor could he see either the Oregon or Washington shore and after changing the course of his gasoline boat several times he finally found himself at the end of the Brandt trap, where he tied his boat. Another fisherman, Olaf Vog, was likewise operating a gill-net in the channel of the river near to and a short distance above the Anderson trap. When he reached what he supposed was the end of his drift, or the place where he "should start to pick up" he took up his gill-net and although he "wanted to get over to the Oregon shore" he found himself on the Washington side at the Anderson trap, where he tied up "and laid down in the boat."

Not being able to see the range lights, upon leaving Bugby Hole the master of the "Samson" navigated his vessel by clock and compass by noting the time shown by the clock and by observing the course recorded in his course-book. He explained that 14 minutes of running would have brought the flotilla to the Anderson trap; that at the end of 11 minutes he slowed down and at the end of 12 or 13 minutes he stopped the engines and drifted. After Puget Bar is crossed and while passing the Brandt and Anderson traps, vessels, when following the usual course, are not navigated on a tangent but are steered along the line of a slight curve. The two traps are on the outer side of this curve. The usual course taken by vessels is farther out from the Brandt trap than from the Anderson trap and yet Tholo, the fisherman who had tied up his boat

at the Brandt trap, says that the "Samson" and the barges passed within 20 feet of the Brandt trap. According to this witness the "Samson" with its barges proceeded down the river through the waters between the Brandt and Anderson traps and then ran on through the latter trap. The flotilla ran through the lead of the Anderson trap at a point between the heart and inner end of the lead, taking out 24 piling and ran so close to the heart of the trap that only one or two piling next to the heart and in the lead remained standing.

Anderson repaired the trap and at the end of two weeks from the date of the accident was able again to operate it. He sued the Columbia Contract Company for the total sum of $1,618.60. This total sum embraced two items; one for $818.60, the cost of repairing the trap, and the other $800, the amount of the "money and profits" which Anderson alleges he could and would have earned if the trap had not been injured.

The complaint contains six specifications of negligence. The plaintiff alleges: (1) That although there was a fixed channel and course in which vessels navigating the river should be operated, the defendant negligently failed to keep the tugboat within the limits of "said channel and carelessly and negligently navigated said vessel outside and beyond said fixed course and channel and into and against said fish-trap;" (2) that the defendant negligently failed to maintain sufficient lights upon the vessel so that objects lying in the stream could be seen and avoided; (3) that the defendant negligently failed to maintain a lookout and neglected to keep a sufficient watch ahead; (4) that the defendant negligently failed to see and avoid striking the trap; (5) that the defendant negligently operated

the vessel at a dangerous and unsafe rate of speed; and (6) that the defendant negligently failed to stop the vessel and to run aside so as to avoid the fish-trap after the trap was or should have been seen by the defendant.

In its answer the defendant denies that it was guilty of negligence in any particular. As a further answer to the complaint the defendant avers that the fish-trap was unlawfully built and maintained and in such a manner that it obstructed the navigable channel of the river and was a menace to navigation; that the trap was unlawfully maintained in two particulars: (1) that it extended from the shore to a point in the navigable channel in the river; and (2) "that the signals and lights were not maintained thereon as required by law." The defendant alleges that at a time when it was lawfully navigating the river on a dark and foggy night and while moving slowly down the stream "in the channel thereof," and "solely because the said fish-trap was so located that it obstructed the navigable channel of the said river, the said steamboat with its tow ran into said fish-trap."

The plaintiff replied by traversing the affirmative allegations of the answer.

REVERSED AND REMANDED.

For appellant there was a brief over the name of *Messrs. Teal, Minor & Winfree,* with an oral argument by *Mr. Wirt Minor.*

For respondent there was a brief over the name of *Messrs. Malarkey, Seabrook & Dibble,* with an oral argument by *Mr. A. M. Dibble.*

HARRIS, J.—The foregoing statement may be summarized by saying that the defendant attempted to navi-

gate the river at a time when it was so foggy that one could not see ahead and the range lights ceased to be an aid to navigation; that the defendant left Bugby Hole with the intention of following the usual course taken by vessels across Puget Bar and past the Anderson trap; that the towboat and barges were successfully navigated across Puget Bar; that the river is between 2,000 feet and a mile wide, at the point where the Anderson trap is located; that between 500 and 4,000 feet of that width opposite the Anderson trap is sufficiently deep for the navigation of vessels; that the usual course followed by vessels is between 200 and 1,000 feet from the outer end of the Anderson trap; that instead of following the usual course, as the master of the "Samson" says he intended, the flotilla, because of some controverted reason, got out of the usual course of vessels at a point at least 1,800 feet, and probably more, above the Anderson trap and proceeded on down the river outside of the usual course, but in waters deep enough for the navigation of the towboat and barges to and through the Anderson trap.

1. It is appropriate here to add to what already has been said that the master of the "Samson" testified that he did not see the Brandt trap at all and that it was so foggy that he did not see the Anderson trap until he was about 100 feet from it. On the other hand, Christian Tholo testified that the fog lifted before the "Samson" reached the Anderson trap and that when the boat was "in front of the lower range light" (300 feet above the Anderson trap) it was "swinging" and that at that time he saw the light on the end of the Anderson trap. The witness Vog corroborated the testimony of Tholo by saying that after the flotilla went through the trap "I was looking around and I could see the shore, the house ashore and

the woods back of the house." Anderson explained that his house was 600 feet below the front range light; and hence if his testimony is taken as true the trap, which was 300 feet below the range light, was 300 feet above the house. The "Samson" was displaying a red light on the port side and a green light on the starboard side as well as two white lights on the masthead as required by the regulations. There was a white light on the outside of each barge. These lights, however, served to enable others to see the "Samson" rather than to enable the "Samson" to see other objects. In addition to the lights already mentioned the "Samson" was equipped with both an arc and a search light. The master of the vessel stated that the searchlight is not used in foggy weather, for the reason that such a light hinders rather than aids navigation. Besides the master who was at the time of the accident at the "Samson's" wheel there was a sailor on duty on the "Samson" as a lookout. There was a man on each barge but each of these three men was asleep.

As already stated, Captain Church testified that at the end of 11 minutes he slowed down and at the end of 12 or 13 minutes after leaving Bugby Hole he stopped the engines and drifted; but opposed to this evidence there was the testimony of Christian Tholo who told the jury that "when she passed me she had the speed that she usually had" and that after he saw the "Samson" she was going, so far as he could observe, "as she usually goes when it is clear." There was testimony for the plaintiff to the effect that vessels either anchored or tied up in heavy fogs; but there was also evidence for the defendant to the effect that only loaded ocean-going vessels, whether with or without a tug, anchored and that towboats with barges never anchored or tied up on account of the fog. The

master of the "Samson" testified that if the towboat
had been equipped with a stern-wheel he could have
backed out after seeing the trap and thus avoided it,
but since the boat was equipped with a propeller an
attempt to back out at any time after he saw the
Anderson trap would have resulted in the flotilla
swinging around and striking the trap broadside and
thus causing greater damage to the trap.  He also
stated that when he discovered his predicament he
started the engines and went through the lead of the
trap as straight as he could and by so doing did the
least possible damage; and that if he had not done this
the flotilla would have taken out the heart of the trap.
It is apparent from this brief account of the evidence
that the questions of whether or not the defendant
negligently failed to maintain sufficient lights, or negli-
gently failed to keep a lookout, or negligently failed to
see and avoid the fish-trap, or negligently operated the
flotilla at a dangerous rate of speed, or negligently
failed to stop the "Samson" and her tow and avoid
the fish-trap, were all properly submitted to the jury.
There was evidence upon both sides of these contro-
verted questions and it was therefore the province of
the jury to determine the facts.  The trial court did
not commit error, as contended by the defendant, in
asking the jury to decide whether the corporation was
negligent in respect to any of those five specifications
of negligence.

Much of the discussion in the briefs relates to the
allegation that the defendant "negligently failed to
keep and maintain said tugboat within the limits" of
the fixed channel and course in which vessels were usu-
ally operated.  The defendant has urged numerous
objections to the instructions given by the court, con-
tending that some of them were erroneous and that

several of them were inconsistent with each other. The position taken by the defendant is rested largely upon the application which it contends should be made of the rule which gives paramountcy to the right of navigation.

2, 3. The Columbia River is a navigable stream and as such is a common highway "and forever free." This right is a public one and it is not only given by the common law but is preserved by the statute admitting the State of Oregon into the Union: *Johnson* v. *Jeldness,* 85 Or. 657, 661 (167 Pac. 798, L. R. A. 1918A, 1074). The right of fishery is likewise a common right. The right of navigation is paramount, for the reason that it is of the most importance to the public weal: *Davis* v. *Jerkins,* 50 N. C. (5 Jones L.) 290, 293; *Post* v. *Munn,* 4 N. J. Law (7 Am. Dec. 570, 1 Southard's Rep. 61); *Flanagan* v. *City of Philadelphia,* 42 Pa. St. 219, 228. Stated in general terms the right of fishery must give way to the right of navigation. Expressed in more accurate language the paramountcy of the right of navigation does not extinguish the right of fishery although the former does, whenever there is a necessary conflict, limit the latter and compel it to yield so far as the right of fishery interferes with the fair, useful and legitimate exercise of the right of navigation. Speaking of the abstract right of the public it may be said as expressed in 1 Farnham on Waters, Section 27:

"The public is entitled to the free, uninterrupted, and unobstructed use of every part of the stream, from bank to bank and throughout the length of the channel, which at the ordinary stage of the water is of such depth and of such accessibility with respect to the current or main body of the stream as to be capable of navigation by boats * * either up and down or across, or from the main stream on to any particular part in

question, or thence on to the body of the stream; and this whether such part has ever been so used, and whether there is any present or anticipated necessity for so using it." -

Continuing to employ general terms when referring to the right of navigation, in the abstract, a boat has a right to "take her course" and to go when and where it is necessary to go and is not obliged to stop or go out of her way or wait upon the movements of those who are managing a fishing seine or net; and yet this right of navigation which entitles the public to the unobstructed use of every part of the stream which is capable of navigation by boats and authorizes a boat to "take her course" cannot be exercised without regard to the rights of others. The navigator of a public stream must manage his craft with ordinary care and with due regard to the rights, property and lives of others: 1 Farnham on Waters, §§ 27, 31 and 33; *Spry Lumber Co.* v. *The C. H. Green,* 76 Mich. 320, 332 (43 N. W. 576). While a boat may "take her course" nevertheless a navigator cannot with impunity do unnecessary damage to a fisherman or his property; but upon the contrary the paramount right of navigation must be exercised fairly, and not arbitrarily, and with due regard to the subordinate right of fishery and a boat must be so navigated as not to do unnecessary damage: 1 Farnham on Waters, § 33a; Gould on Waters (2 ed.), § 87; *Porter* v. *Allen,* 8 Ind. 1 (65 Am. Dec. 750); *Lewis* v. *Keeling,* 46 N. C. (1 Jones L.) 299, 307 (62 Am. Dec. 168); *Post* v. *Munn,* 4 N. J. Law (7 Am. Dec. 570, 1 Southard's Rep. 61). For example, if nets are placed across the channel of a river so as to be a bar to navigation, a vessel may, if reasonably necessary to do so, run over the nets; but if a navigator is warned or ought to have

known of his approach toward the net of a fisherman, he is liable for damage resulting from his negligent failure to avoid doing damage if he can do so without prejudice to the reasonable prosecution of his voyage: *Horst* v. *Columbia Contract Co.*, 89 Or. 344, 350, 352 (174 Pac. 161); *Hopkins* v. *Norfolk & S. R. Co.*, 131 N. C. 463 (42 S. E. 902); *Cobb* v. *Bennett*, 75 Pa. St. 326, 329 (15 Am. Rep. 752); *Wright* v. *Mulvaney*, 78 Wis. 89 (46 N. W. 1045, 23 Am. St. Rep. 393, 9 L. R. A. 807). The ruling in *Wright* v. *Mulvaney* is of peculiar interest, for the reason that there as here a pound net fish-trap was injured by a boat with a tow and some of the other material particulars were like the facts presented here. The court says:

"But it does not necessarily result from this (the paramount right of navigation) that the navigator may carelessly and negligently run his vessel upon the nets of fishermen and destroy them, and escape liability therefor merely because he did not do so maliciously or wantonly. Such a proposition shocks any proper sense of justice. The benefit which the navigator is entitled to claim by reason of his paramount right is, we apprehend, that when the two rights necessarily conflict the inferior must yield to the superior right. But he may not by his own negligence unnecessarily force the two rights into conflict, and then claim the benefit of the paramount right."

4. When it is said that the public is entitled to navigate upon any part of the navigable waters of a stream without obstruction it must always be understood that reference is made to unlawful and not lawful obstructions. An obstruction placed in a stream may be authorized by competent authority and consequently the right of navigation is limited by that kind of an obstruction: Gould on Waters (2 ed.), § 87; *Davis* v. *Jerkins*, 50 N. C. (5 Jones L.) 290, 293; *Flanagan* v. *City*

*of Philadelphia,* 42 Pa. St. 219, 232; *Lewis* v. *Keeling,*
46 N. C. (1 Jones L.) 299, 306 (62 Am. Dec. 168);
*Pound* v. *Turck,* 95 U. S. 459 (24 L. Ed. 525, see, also,
Rose's U. S. Notes). If authority is granted for the
erection of an obstruction in a navigable stream and
the obstruction is so placed as to be partly beyond the
limits of the authorization, then in that event the ob-
struction is unlawful and a nuisance only to the extent
that the authority has been exceeded: *Knox* v. *Chal-
oner,* 42 Me. 150, 156; *Renwick* v. *Morris,* 3 Hill
(N. Y.), 621, affirmed in 7 Hill (N. Y.), 575. Even
though an obstruction is wholly or partially unauthor-
ized, nevertheless this lack of authority for the erection
or maintenance of the obstruction does not necessarily
operate as authority to a navigator negligently to de-
stroy the obstruction: 1 Farnham on Waters, § 33;
*Dimes* v. *Petley,* 15 Q. B. 276 (19 L. J. Q. B., N. S., 449,
14 Jur. 1132); *The Brinton,* 66 Fed. 71 (13 C. C. A.
331).

5, 6. We may now direct attention to some of the
instructions which the court gave to the jury. After
defining negligence and explaining that the plaintiff
could recover if the defendant was and he himself was
not guilty of negligence the court told the jury, in in-
struction No. 3, that "it is charged" in the complaint
"that at said time the said boat was being operated
outside of and beyond the channel or course in which
such vessels should be operated"; and then follows
an enumeration of the remaining five specifications of
negligence. Having referred to the first specification
of negligence in the language already quoted and hav-
ing enumerated the other five specifications the court,
in instruction No. 4, then said:

If you find the defendant was "guilty of any one or
more of said charges, and if you so find that any one

or more of said charges which you may so find defendant guilty of constituted negligence or lack of due care" and that such acts caused the injury then "plaintiff is entitled to a verdict" unless his own negligence contributed to the injury.

The jury was properly told, in instruction No. 5:

"That in operating its said vessel the duty rests upon defendant to operate the same in a reasonably careful manner, so as to avoid colliding with or injuring structures along the shore."

The next instruction related to the right and duty of the defendant when navigating in the fog and the succeeding instruction referred to the duty of maintaining a lookout. The next instruction, No. 8, reads as, follows:

"It was also the duty of defendant to operate and navigate said vessel in the channel or usual course in which vessels navigating said river should be operated and navigated."

In instruction No. 9, the jurors were told:

"If you find from a preponderance of the evidence, therefore, that defendant failed to perform any one or more of these duties, then defendant was negligent and not in the exercise of due care."

Instruction No. 26 is important because it was given at the request of the defendant. This instruction begins by saying that if the jury found that the plaintiff had obtained permits from the State of Washington and the United States and had erected and maintained the trap in the place and manner provided by such permits and if the jury further found—

"That the defendant was careless and negligent in piloting, operating and navigating its towboat 'Samson,' and in thereby causing the same to run into and against the said fish-trap of plaintiff, and that the fish-trap was thereby damaged and injured the plaintiff is

entitled in such case, and in such case only, to recover from the defendant the amount of his damages; provided that the negligence of the defendant which occasioned the injury consisted in the failure of the defendant to keep and maintain its towboat within the limits of the navigable channel of the Columbia River and outside and beyond the fixed course and navigable channel of said river; or that the defendant failed to keep and maintain adequate and sufficient lights upon its towboat so that objects lying in the Columbia River could be seen and avoided; or that the defendant failed to keep and maintain a lookout upon its towboat and failed to keep and maintain a sufficient watch ahead; or that the defendant through negligence in looking ahead failed to see the fish-trap; or that, having seen the fish-trap, the defendant failed to use such means as were available to avoid striking and injuring the same; or that the defendant operated and propelled its towboat at a dangerous rate of speed, or at an unsafe rate of speed with regard to the condition of the weather, the atmosphere and the circumstances and conditions surrounding the locality where the accident complained of is alleged to have occurred; or that the defendant, having means to stop its towboat or to turn aside and thus avoid the fish-trap after the same was seen, failed to employ said means efficiently or to take proper and timely steps to stop its towboat or to turn aside and thus avoid the said fish-trap.''

Instruction No. 8 was clearly erroneous. Instruction No. 3, standing alone, is not strictly accurate for the reason that it states that the complaint charges that ''the boat was being operated outside'' instead of including the element of negligence and saying that the boat was being ''negligently'' operated outside of the channel. However, when this instruction is construed in connection with instruction No. 4, then the two when taken together harmonize with the complaint. The plaintiff does not rely in his complaint upon the bald fact that the defendant got outside of

the channel usually followed by vessels, but he relies upon the charge that the—

"Defendant carelessly and negligently failed to keep and maintain said tugboat within the limits of said channel and carelessly and negligently navigated said vessel outside and beyond said fixed course and channel."

The position of the plaintiff with respect to instructions 3 and 4 is made plain by the following excerpt taken from his printed brief:

"By said instructions, III and IV, the Court charged the jury that it was alleged in the complaint that appellant carelessly and negligently operated its boat outside of and beyond the channel or course in which vessels should be operated and that if the jury found, not only that appellant did this, but that its action in so doing resulted from negligence or a lack of due care and they also found that such negligence caused the damages to the trap respondent was entitled to recover, unless he was, himself, guilty of contributory negligence.

"In other words, the court instructed the jury that before they could find against appellant for navigating outside the channel or usual course of vessels they must find that it did so unnecessarily and because of negligence and a want of due care. It was properly left to the jury to say from all the circumstances taking into consideration the location of the trap and the width of the channel, whether appellant's action in going outside of the usual channel and course of vessels was the result of an unfair or negligent exercise of its right of navigation."

Instruction No. 26 is entirely consistent with instructions 3 and 4 and is in harmony with the construction which the plaintiff places upon these two instructions. Instruction No. 8, however, told the jury that it was the duty of the defendant to navigate its vessel

in the channel and the usual course taken by boats.
When this instruction is considered in the light of all
the instructions which had been previously given and in
connection with instruction No. 9, it was equivalent to
charging the jury that if the defendant got outside of
the channel or usual course taken by vessels, that fact
alone and of itself convicted the defendant of negli-
gence; for after saying in instruction No. 8 that it was
the duty of the defendant to operate its boat in the
usual course taken by other vessels, the court said in
instruction No. 9 that if ''defendant failed to perform
any one or more of these duties'' then the defendant
was negligent.   It was not negligence *per se* for the
defendant to navigate the flotilla outside of and be-
yond the course usually followed by vessels.   It was
a question of fact for the jury to say whether the de-
fendant failed to exercise ordinary care in the navi-
gation of its flotilla.   It may fairly be assumed that
the defendant concedes that when its flotilla left Bugby
Hole its captain intended to follow the usual course
taken by vessels and did not intend to go between the
Brandt and Anderson traps; the defendant does not
contend that the business in which it was engaged re-
quired it to go outside of the usual course or to navi-
gate the waters between the Brandt and Anderson
traps; and consequently the ultimate question of fact
is whether the defendant failed to use due care when
transporting the rock down the river, and although a
failure to keep within the usual course taken by ves-
sels is not negligence as a matter of law, nevertheless
as stated in *Porter* v. *Allen,* 8 Ind. 1, 4 (65 Am. Dec.
750), ''though it was proper for the jury to consider
the fact'' that the boat was not in the usual and ordi-
nary channel where boats are usually run ''in connec-

tion with the other facts proved in the case, still it was alone insufficient to control the verdict.''

The charge to the jury should, of course, in this as in all cases, be considered as a whole with the view of ascertaining if possible whether the rights of the appealing litigant were so prejudiced as to prevent a fair trial. Instruction No. 8 was not a mere parenthetical statement made during the course of the charge, but it stands out as prominently as any other single instruction appearing in the charge, and it contains plain language which the jury could not have misunderstood; and hence a reversal of the judgment becomes necessary.

7. The defendant insists that the Anderson trap was an unlawful obstruction. The plaintiff was authorized by both the State of Washington and the United States to erect and maintain the trap. All the evidence shows that the trap was neither above nor below the place indicated in the permits, although there is a controversy as to whether or not the trap extended farther out into the river than allowed by the permit given by the United States. The defendant argues that all that part of the trap which was taken out when the flotilla went through the lead was beyond the limits fixed by the permit. The evidence shows conclusively that the 24 piling taken out were either in whole or in part within the limits of the federal permit. The defendant argues that the trap exceeded the length allowed by the permit by 180 feet. Even though it be assumed that the trap was 180 feet too long, still it must be remembered that the heart was 50 feet wide, and if to this width is added the distance covered by the one or two piling left standing next to the heart, and also the distance covered by the 24 piling taken out, it will be seen that only a part of the obstruction

was unlawful in the sense that it exceeded the author-
ity given to the plaintiff.  If, on the other hand, the
trap did not extend beyond the point allowed by the
permit, then all of it was authorized and no part of it
was an illegal obstruction.  No part of the trap was
within the usual course followed by vessels going up
or down the river.

8. The defendant has urged with much vigor that
this is a local action and therefore triable only in the
State of Washington.  The plaintiff first obtained a
permit from the United States in 1901 and he oper-
ated under that permit until 1912 when he received a
new permit.  In each year of that period, except pos-
sibly four or five years when he did not put in the
trap, the plaintiff drove the piling for his trap and
completed its construction a short time before the fish
began to run and then when the fishing season ended
for that year he pulled out the piling and removed the
trap.  No part of the trap was driven into the earth
except the piling; and all the piling were driven by
the owner with the intention on his part of removing
them at the end of the season; and hence the trap was
only personal property: *Johnson* v. *Pacific Land Co.,*
84 Or. 356 (164 Pac. 564); *Roseburg National Bank* v.
*Camp,* 89 Or. 67 (173 Pac. 313).  The trap was only
an appliance used by the plaintiff in the exercise of
his right to fish.  The action is not one for trespass
upon real property; nor is it prosecuted on account
of any assault upon the right of fishery.  The trap was
personal property and was used as an appliance by
the plaintiff, a salmon fisherman; and when that appli-
ance was damaged the result was not different in prin-
ciple from the situation presented by some person
negligently breaking an ordinary trout-rod which the
owner was using for casting from the bank into a

stream and even though the trout fisherman owned the
bank upon which he stood, while casting. The injury
complained of was damage to the trap and the action
is transitory.

9. The next question relates to the measure of dam-
ages. The court said to the jury that if the plaintiff
was entitled to recover at all he was entitled "to such
damages as you may find from a preponderance of the
evidence will fairly compensate him for the loss he has
suffered"; and that—

"There are two elements of damage to be consid-
ered by you. First, you will consider and determine
from the evidence the reasonable amount that it would
be necessary to expend to repair plaintiff's trap and
restore it to the same or as good condition as it was
before the injury. Second, you will determine from
the evidence the value of the use of plaintiff's trap
during such time as it was necessarily delayed by the
injury to it. The sum of these two elements so deter-
mined by you would be the amount plaintiff is entitled
to, if entitled to any sum."

Besides evidence relating to the cost of repairing
the trap there was testimony concerning the number
of fish caught by the Anderson trap before the acci-
dent and also after the trap was repaired as well as
testimony about the catch made by other traps in that
locality and on the same side of the river. The Ander-
son trap had been in operation from September 10,
1911. There was evidence to the effect that the catch
made by the Anderson trap averaged 1,500 or 1,600
pounds a day for a few days before the accident; that
the fish "generally run steady on that place there,
right along. When we have a run, we have one at
about the same time as the other places." The plain-
tiff testified that the "run of Silver-side Salmon" con-
tinued during the period of two weeks while his trap

was out of repair "because the rest of the traps above
me and below me had lots of fish at the time when she
was broke off"; that during those two weeks the traps
above and below his trap "were catching up to a
couple of tons a day"; that after the trap was re-
paired the average catch was "about 1,600 or 1,700
pounds per day." Charles Brandt, who was an experi-
enced trap fisherman and thoroughly familiar with the
Anderson trap, testified that he knew the reasonable
value of the use of the Anderson trap and that its
value was "between $50 and $60 a day" during "the
time she was broke down"; however, he also stated
that he never knew of a trap having been rented for a
money rental but that all the leases coming to his
knowledge had been "on the shares." This witness
further explained that the Anderson trap "was a trap
that caught the fish, and she is the best trap there is
in" that locality; that he "would be willing to pay the
man $50 a day for the use of that trap"; and that "I
go on the basis of what catch she is making" when
estimating the value of the trap. The weather condi-
tions, according to all the evidence, were favorable.
The foregoing is substantially all the evidence relating
to the value to the use of the trap.

The defendant contends that it was error to receive
evidence of the average catch of the Anderson trap be-
fore and after the accident; that the testimony about
the catch made by other traps, located above and be-
low the Anderson trap, was erroneous. The defend-
ant took the position that the occupation of a fisher-
man is uncertain and precarious and that his profits
are necessarily speculative and for that reason the de-
fendant requested, but the court refused to give, the
following instruction:

"The value of the fish-trap of the plaintiff, if you should find that the plaintiff is entitled to recover is a matter of easy determination, and inasmuch as the trap is put in for one season only, I charge you that the measure of damages for the use of the trap is interest upon such value as you may find the trap to have had at the time of this injury for such period as you may deem reasonable, but not over the period of one year at the rate of six per centum (6%)."

The law aims to allow full and complete compensation to an innocent party who has been damaged by the breach of a contract or the commission of a tort. In practice, the law does not prove false to its theory by banning profits merely because of their nature as profits; but upon the contrary the law endeavors faithfully to realize its aim by allowing compensation for profits which it is reasonably certain would have been made if the wrong complained of had not been done: *Allison* v. *Chandler,* 11 Mich. 542 (8 R. C. L. 501); *Bredemeier* v. *Pacific Supply Co.,* 64 Or. 576 (131 Pac. 312); *Fields* v. *Western Union Tel. Co.,* 68 Or. 209, 217 (137 Pac. 200); *McGinnis* v. *Studebaker,* 75 Or. 519 (146 Pac. 825, 147 Pac. 525, Ann. Cas. 1917B, 1190, L. R. A. 1916B, 868); *Feeney & Bremer Co.* v. *Stone,* 89 Or. 360 (171 Pac. 569, 174 Pac. 152); *Fletcher* v. *Fischer,* 93 Or. 265 (182 Pac. 823). In the absence of malice the law endeavors to compel reparation rather than punishment. When attempting to compel reparation the difficulties encountered by the administrators of the law consist in the application rather than in the interpretation of the rules prescribed for the measurement of damages. There is no single rule applicable alike to all cases, involving profits which may be taken into account, when fixing the amount of compensation for the breach of a con-

tract or the commission of a tort.    In some cases profits constitute either the sole or one of the elements of damages and therefore are to be taken as the measure of the amount of compensation; and in other cases profits constitute only an item of evidence to be taken into consideration, together with other evidence, by the jury when fixing the amount of compensation.

If the complaint is strictly construed, it must be interpreted to mean that the plaintiff is suing for profits as an element of damages, and hence if entitled to recover on his theory of the case he would be entitled to have this element of damage measured by the amount of the profits.    The instruction of the court, however, is based on the theory that the plaintiff is entitled to recover the value of the use of the trap, and we think that the theory of the trial court is correct and in harmony with the principle which supports the holding in *Williams* v. *Island City Milling Co.*, 25 Or. 573 (37 Pac. 49).    One witness testified that he never knew of a trap having been rented for a money rental, and hence it may be that the trap does not have a rental value in the same sense that the words "rental value" are used when referring to a storeroom or a dwelling-house in a city; and yet the trap did have a usable value.    The trap was usable for only one purpose and it was valuable for that and no other purpose, and the damages must, in order to award compensation, be ascertained by an inquiry into the value of the use of the property to the injured party for the time he was deprived of it.    Past results ought to be of some aid in fixing the usable value, and in the very nature of things one of the first inquiries that one would naturally make when estimating the usable value of the trap would be: How many fish did the trap catch?    Admission of evidence concerning the catches made by the trap before the

injury is fully supported by the doctrine stated in *Williams* v. *Island City Milling Co.* See, also, the luminous opinion in *Standard Supply Co.* v. *Carter,* 81 S. C. 181 (62 S. E. 150, 19 L. R. A. (N. S.) 155). While the past success of the trap is not controlling, it is nevertheless one of the factors which may be taken into consideration, not as the measure of damages, but to aid the jury in estimating damages: *Post* v. *Munn,* 4 N. J. L. (1 Southard's Rep.) 61, 63, (7 Am. Dec. 570); *Wood Transfer Co.* v. *Shelton,* 180 Ind. 273 (101 N. E. 718). See, also, *Jacobs* v. *Cromwell,* 216 Mass. 182 (103 N. E. 383).

That there was a good run of fish during the two weeks is evidenced, the plaintiff says, by the fact that the weather conditions were good, by the significant circumstance that other traps in the same locality, but less favorably situated than the Anderson trap, caught each day "up to a couple of tons a day," and by the important fact that when the Anderson trap was repaired it caught each day from 1,600 to 1,700 pounds of fish. Does not this evidence of the catches made during the two weeks as well as the catches made immediately afterwards serve to make more certain any inference of usable value that may be drawn from prior results? Obviously the testimony about the run and catch of fish during the two weeks when the trap was out of repair and the catches made by the Anderson trap when again put in repair constituted data which would be very helpful in fixing the usable value of the trap for those two weeks. The fishing season is of comparatively short duration, and consequently the usable value of the trap might be negligible at one time of the year and considerable at another. In brief, the evidence under discussion was competent, not for the purpose of measuring the com-

pensation to be paid to the plaintiff, but for the purpose of aiding the jury in estimating the usable or rental value of the trap.

There are other exceptions presented by the record, but since the questions arising out of them are not likely to recur upon a retrial, we deem further discussion unnecessary.

The judgment is reversed and the cause is remanded for a new trial.        REVERSED AND REMANDED.

McBRIDE, C. J., and BURNETT and BENSON, JJ., concur.

---

Rehearing denied November 25, 1919.

PETITION FOR REHEARING.

(185 Pac. 231.)

Respondent's petition for rehearing denied.

DENIED.

*Messrs. Malarkey, Seabrook & Dibble,* for the petition.

*Messrs. Teal, Minor & Winfree, contra.*

HARRIS, J.—In the original opinion we ruled that instruction No. 8 made it necessary to reverse the judgment. The plaintiff earnestly insists in the petition for a rehearing that—

Instruction No. 8 which was given at the request of plaintiff, "is merely a statement with which everyone will agree, namely, that it was the duty of appellant to operate and navigate its vessel where vessels should be operated and navigated."

The petition for a rehearing contains no new argument, for at the hearing as well as in his printed brief, the plaintiff vigorously contended that instruction No. 8 was devoid of error and the reasons given for that contention were the same as those now assigned by him.    However, we have again examined and considered the record with the same result as before.    As stated in the original opinion this instruction was not a parenthetical statement, but upon the contrary it stood out as boldly and prominently as any other instruction.    When instruction No. 8 is viewed in the light of the allegation that

"although there was at said time and place a fixed channel and course in which vessels navigating said river should be operated, said defendant carelessly and negligently failed to keep and to maintain said tugboat within the limits of said channel and carelessly and negligently navigated said vessel outside and beyond said fixed course and channel,"

and when this instruction is viewed in the light of the evidence concerning the location of the course usually followed by vessels, it appears manifest to us that the instruction in effect stated to the jurors that it was the duty of the defendant to navigate its flotilla in the channel and course usually taken by boats.

Among other instructions, the court gave, at the request of the defendant, instruction No. 29, which reads as follows:

"Vessels navigating the Columbia River are not required to keep in the dredged channel, where there is a dredged channel, nor in the center of the navigable channel.    For instance, you may legally and without negligence navigate any part of the navigable channel of said river where the depth of water is sufficient therefor."

The plaintiff now argues, just as he contended in his printed brief, that instruction No. 8 is not prejudicial when considered in connection with instruction No. 29. The answer to this argument is that one instruction is inconsistent with the other. Construing instruction No. 8 as we do, then the inevitable conclusion is that this instruction was prejudicial error. We adhere to the original opinion and the conclusion there reached.

The petition for a rehearing is denied.

REVERSED AND REMANDED.    REHEARING DENIED.

---

[Argued October 17, affirmed November 25, 1919.