## THE AMOLCO.

### GREEN v. BOSTON MOLASSES CO.

(Circuit Court of Appeals, First Circuit. October 3, 1922.)

No. 1546.

1. Collision ☞91—Disregard of narrow channel rule.

A collision in the daytime between a loaded steamship entering New York Harbor through the Ship Channel and a steam trawler passing out *held* due solely to the fault of the trawler in disregarding the narrow channel rule and the port to port passing rule as well as the signals of the steamship, which was properly keeping to the starboard side of the channel.

2. Collision ☞91—Steam vessels approaching "end on or nearly so."

Approaching vessels whose courses diverge not more than one or two points are meeting "end on or nearly so," within article 18 of the Inland Rules (Comp. St. § 7892), and are required to pass port to port.

Appeal from the District Court of the United States for the District of Massachusetts; James M. Morton, Judge.

☞For other cases see same topic & KEY-NUMBER in 'all Key-Numbered Digests & Indexes

Suit in admiralty for collision ,by Louis H. Green, owner of the steam trawler Heroine, against the steamship Amolco; the Boston Molasses Company, claimant. Decree for respondent, and libelant appeals. Affirmed.

For opinion below, see 273 Fed. 614.

Leonard J. Matteson, of New York City (T. Catesby Jones and Bigham, Englar & Jones, all of New York City, on the brief), for appellant.

Stephen R. Jones, of Boston, Mass. (Foye M. Murphy and Blodgett, Jones, Burnham & Bingham, all of Boston, Mass., on the brief), for appellee.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

JOHNSON, Circuit Judge. [1] This is an appeal from the final decree of the District Court for the District of Massachusetts upon a libel filed by the owner of the steam trawler Heroine against the steamship Amolco to recover damages by reason of a collision between them in the upper bay of New York Harbor on the forenoon of April 23, 1920, on the easterly side of the main Ship Channel, about halfway between buoys 12 and 14. The Amolco, heavily loaded, was inward bound, and, having passed on her starboard at a distance of 200 or 300 feet buoy No. 12, which marks quite a sharp bend in the channel, was proceeding at half speed of 6 or 7 knots in a general northeasterly direction up the channel, intending to enter a dock at the Erie Basin on its easterly side.

The Heroine was outward bound and proceeding down the channel in a general southwesterly course. The weather was clear, and the channel between the two vessels was free from craft of all kind when they came in sight of each other.

The testimony for the Amolco was that about the time she passed buoy 12 the Heroine was sighted from half a point to a point upon her port bow; that her compass course at buoy 12 was changed to northeast ¾ north; that when she sighted the Heroine the Amolco gave a signal by one blast of her whistle, signifying that she intended to pass the Heroine port to port and ported her helm a little; that she was cross-signaled from the Heroine by two blasts of her whistle, signifying a starboard to starboard passing; that to this the Amolco replied with one blast of her whistle and ported her helm still further, causing the Amolco to swing to starboard; that the Heroine replied with two blasts of her whistle; that the vessels had now got so near each other that the captain of the Amolco, seeing that collision was imminent, caused three sharp blasts of the whistle to be blown and her engines to be reversed; that the Heroine did not change her course from the time she was first sighted by the Amolco, and was struck by the latter upon her starboard quarter about 25 feet from her stern.

The testimony for the Heroine was that she had left Fulton Market about 25 minutes before the collision and was bound to sea on a fishing trip; that she passed between Governor's Island and the Battery and crossed to the starboard side of the Ship Channel, steering about

southwest to avoid tows bound in; that about opposite the entrance to the Pennsylvania Terminal Channel she changed her course to southwest by south, heading for buoy No. 12, which course took her on a long slant across the channel from her starboard to port; that she was proceeding at between 9 and 11 knots; that she first saw the Amolco about a mile away, about a point on her starboard bow; that the Heroine continued her course and speed until the distance between the vessels was about half a mile, when she then blew a signal of two blasts to the Amolco and kept her course; that she was then on the Amolco's starboard bow, and that, if each vessel had kept her course and speed, the Amolco would have passed clear under the stern of the Heroine; that the Heroine received no immediate reply to her two-blast signal, but after an interval, which the captain of the Heroine estimates at one minute, the Amolco blew a signal of one blast; that, as soon as this was received, the captain of the Heroine slowed down, blew a danger signal of four blasts, then reversed his engines and blew a signal of three blasts, signifying that he had done so; but that the Amolco came on and struck the Heroine on the starboard quarter near the stern.

The only testimony from any one, outside of those upon the two vessels, came from the captain of a tug which was following in the wake of the Amolco, intending to tow her into the Erie Basin, and he corroborated the testimony for the Amolco as to the signals which were given and also the testimony of her officers that she was proceeding upon the starboard side of the channel about a ship's length from the line between the buoys and nearly parallel with it.

In this conflict of testimony the District Court has found that signals were given according to the testimony for the Amolco, and these findings are sustained by the preponderating weight of the evidence.

It has been held that "Ship Channel," in which the collision occurred, is a "narrow channel" under article 25 of the Inland Rules. The La Bretagne, 179 Fed. 286, 102 C. C. A. 651. This rule is as follows:

"Article 25. In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or midchannel which lies on the starboard side of such vessel."

The court in The La Bretagne, supra, said:

"It is a well-known channel, charted and buoyed, and a steam vessel navigating it should follow the rule which requires her 'when it is safe and practicable' to keep to that side of the fairway or mid-channel which lies on her starboard side. The circumstance that there is a great deal of cross-travel in the upper bay itself does not seem a sufficient reason for abrogating the wholesome rule that vessels moving up or down some designated channel therein shall keep to the starboard side of it. Rule 25 is not to be construed as prohibiting vessels from crossing such channel at any convenient angle whenever the exigencies of their own navigation make it necessary or desirable for them to proceed from one to the other side of such channel; but when no such exigency exists they should keep to the proper side of the channel."

The Heroine was proceeding outward along this channel and the Amolco, with a cargo, was inward bound upon the starboard side of it. Each sighted the other when from one-half to three-fourths of a mile

apart. The day was clear, the wind light, and there was no other craft of any description between them, so that neither hearing nor sight was obstructed on the part of either. While their courses would intersect each other if prolonged far enough, as might be said of all courses not strictly parallel, the vessels were approaching each other in a narrow channel nearly end on, and their navigation was governed by article 18, rule 1, of the Inland Rules (Comp. Stat. § 7892), which in part is as follows:

"Article 18. Rule 1. When steam vessels are approaching each other head and head, that is, end on, or nearly so, it shall be the duty of each to pass on the port side of the other; and either vessel shall give, as a signal of her intention, one short and distinct blast of her whistle, which the other vessel shall answer promptly by a similar blast of her whistle, and thereupon such vessels shall pass on the port side of each other. But if the courses of such vessels are so far on the starboard of each other as not to be considered as meeting head and head, either vessel shall immediately give two short and distinct blasts of her whistle, which the other vessel shall answer promptly by two similar blasts of her whistle, and they shall pass on the starboard side of each other."

[2] The course of the line of buoys was N. E. ⅛ N., and, as the course of the Heroine was S. W. by S., if the Amolco was following the line of buoys, as the District Court has found, when the vessels came in sight of each other, their courses diverged seven-eighths of a point; or, if she was on her compass course, they diverged one-fourth of a point.

In both the American and English decisions, when vessels are approaching each other upon courses of such slight divergence, they have been held to be meeting "end on or nearly so."

In The Victory and The Plymothian, 168 U. S. 410, 418, 18 Sup. Ct. 149, 153 (52 L. Ed. 519), the court said:

"It has often been held as a general rule of navigation that vessels approaching each other in narrow channels, or where their courses diverge as much as 1½ or 2 points, are bound to keep to port and pass to the right, whatever the occasional effect of the sinuosities of the channel."

The court did not mean that the vessels were to "keep to port," but that it was the duty of each to port her helm; otherwise they would not pass to the right.

The witnesses for the Amolco placed the Heroine when first seen at one-half a point or less on her port bow, and the witnesses for the Heroine that the Amolco when first sighted was less than a point on the starboard bow of the Heroine.

The mate of the Heroine estimated that when he first saw the Amolco she was from one-half to a mile away and three-fourths or one-half a point on the starboard bow and "it looked like she would be on an opposite course from us." The helmsman at the wheel of the Heroine stated that the Amolco, when three-fourths of a mile away, seemed "about a point—pretty near to it—on the starboard bow."

It may be that when the witnesses for the Heroine first sighted the Amolco the latter had not completed her turn around buoy 12, where she changed her course; but after she had got around this buoy and was steadied on her course up the channel, which, according to the testimony of her helmsman, was after her stern had passed the buoy

about two lengths, and the Heroine was proceeding on a course S. W. by W., which took her on a long slant across the channel, the vessels were approaching each other from opposite directions, nearly end on, and both common prudence and the rules of navigation required that each maneuver seasonably so as to avoid collision.

It is claimed for the Amolco that she was on her starboard side of the channel as required by the "narrow channel" rule, and that the situation called for a "port to port" passing under the general rule, and for the Heroine, that the vessels were so far to the starboard of each other that it called for a starboard to starboard passing, and that, if the Amolco had kept her course, there would have been no collision.

Under the conflicting evidence the District Court has found in favor of the Amolco's contention, and that the Amolco had the Heroine slightly on her port bow when she first sighted her.

We think this finding is sustained by the greater weight of evidence, increased by the reasonable probability that the Amolco was being navigated by the line of buoys rather than by her compass course, which would have taken her upon a slant across the channel, away from buoy 14, around which she would turn to enter the Erie Basin, for which she was destined. It is apparent from the testimony of her captain that her course was shaped to pass near buoy 14, for, while he testified that he altered his course at buoy 12 to N. E. ¾ N., he stated that this course "would take me up to buoy 14 close aboard." If the Amolco was upon a course which would bring her close to buoy 14 and within 200 or 300 feet of the easterly line of the channel, as testified by Capt. Fitzsimmons of the tug which was following her, and who was familiar with the harbor waters, she must have had the Heroine on her port bow as claimed, and as the District Court has found.

The Amolco seasonably ported her helm slightly and gave the notice required by the rules of one short blast of her whistle, signifying her intention to pass port to port. To this the Heroine replied with two blasts of her whistle. The Amolco immediately blew one blast again, thinking her first signal had not been understood, and that the Heroine would comply with the narrow channel rule and keep upon her starboard side of the channel. When the Heroine replied to this with two blasts of her whistle, the engines of the Amolco were reversed, and her wheel put hardaport, and three blasts of the whistle blown. Under the weather conditions that prevailed and with the distance between the vessels of only one-half or three-fourths of a mile, and no other craft between them, the Heroine must have heard the first one-blast signal blown by the Amolco, and, being seasonably notified of the intention of the Amolco to pass port to port, she could have ported her helm and passed the Amolco safely port to port.

We are satisfied that, in disregard of the narrow channel rule and the port to port passing rule, she took the risk of disregarding the Amolco's signal and attempted to pass the steamship starboard to starboard, and thus save a few minutes time by cutting the corner at buoy 12, and that the collision occurred solely through her fault.

The decree of the District Court is affirmed, with costs to the appellee in this court.