UNITED STATES of America

v.

**M/V MARY E. STAPP, and BARGE CC–422, In Rem and Stapp Towing Company, Inc., In Personam.**

**Civ. A. No. 69–H–894.**

United States District Court,
S. D. Texas,
Houston Division.

Dec. 9, 1971.

Anthony J. P. Farris, U. S. Atty., and Ronald J. Waska, Asst. U. S. Atty., Houston, Tex., for plaintiff.

William A. Harrison, Ross, Griggs & Harrison, Houston, Tex., for defendant.

## MEMORANDUM AND ORDER

CARL O. BUE, Jr., District Judge.

On April 2, 1968, at approximately 4:40 a. m., a collision occurred between the United States Coast Guard utility boat CG–40459, headed eastbound toward the Gulf of Mexico in the Corpus Christi channel and the lead barge of the four-barge tow of the M/V MARY E. STAPP, which was proceeding westbound toward Corpus Christi. As a result of the collision the Coast Guard vessel sank within minutes, but was later salvaged, repaired and placed back in service. There was no damage to the tug, or tow, and there were no personal injuries. The government brought suit against the MARY E. STAPP and Stapp Towing Company for $14,250 in stipulated damages attributable to the sinking and subsequent recovery of the CG–40459, and for penalties as provided for in 33 U.S.C. § 159 for improper display of lights in violation of the Inland Rules, Section 80.16a(b), (j), (k) and (l).

From the viewpoint of those on board the Coast Guard utility boat, the following events occurred: at approximately 12:45 a. m. on the morning of April 2, 1968, the crew of the CG–40459 were ordered and did proceed to the vicinity of the breakwater outside Corpus Christi to assist a grounded vessel. Their mission was unsuccessful, and after ascertaining that the vessel was in no immediate danger, the crew proceeded to a public telephone on the Corpus Christi T-head to call for commercial assistance for the grounded vessel and to notify the Coast Guard station at Port Aransas of their anticipated return. The CG–40459 reentered the Corpus Christi channel and proceeded outbound, and sometime thereafter the cox'n commenced blowing fog signals after encountering patchy fog conditions. It was still dark, and the slightly choppy seas caused moderate intermittent spray to appear on the windshield of the boat. Altogether, the visibility was described as poor, causing the cox'n, James Harper, to enlist the assistance of a crew member, Kenneth Horrell, in order to "keep an eye on the lights," and necessitating the use of the vessel's windshield wipers[1] to dispel the effects of spray across the bow.

At approximately 4:35 a. m., the cox'n of the Coast Guard vessel, having observed the lights of an approaching craft some 200 yards ahead, altered his course to starboard in preparation for a port to port passing. He blew no passing signal. A few minutes later the cox'n realized that a tug was pushing a tow when he saw by the reflection of his own bow light that the CG–40459 was in extremely close proximity to the bow end of the lead barge. He blew no danger signal, but he immediately went full astern on both engines and hard over to port in an attempt to avoid a collision. The starboard forward corner of the lead barge struck the bow of the CG–40459 shortly thereafter, sinking the latter vessel in a matter of a few minutes. The Coast Guard crew relate that no lights were visible on the MARY E. STAPP's tow, that the tug sounded no passing or warning signals, made no effort to alter direction or reduce speed and had no bow lookout.

---

1. Harper depo. at 28 and 35.

The sequence of events leading up to the collision as seen by those on board the MARY E. STAPP is somewhat different. According to Relief Captain William Stapp on the MARY E. STAPP, the tug was proceeding inbound pushing four barges in tandem toward Corpus Christi on Range B and holding to the center of the channel when he observed the lights of a vessel coming toward him. Two vertical white range lights were seen on the mast, and the red port running light was visible, indicating to Stapp that the approaching vessel was crossing the channel from right to left well ahead of the tug and tow. Upon observing the vessel's lights moving toward his port side of the channel, Relief Captain Stapp took steps to maneuver his tow to his own starboard side to insure ample clearance for a possible port to port passing. He suddenly observed that the one red and two white lights were swinging back to his starboard side. Yet he never saw the vessel's green running light. Then the red and white lights disappeared. At this point the tug was put full astern, and this maneuver continued until impact shortly thereafter. The crew of the MARY E. STAPP asserted that all required lights on the flotilla were burning brightly, including the lights on the lead barge, and that all lights were visible. It is further claimed that the Coast Guard vessel, traveling at a speed of 8 to 10 knots, was proceeding at an unsafe speed in view of the limited visibility resulting from spray coming over the bow of the vessel and the failure of the cox'n to employ a proper lookout under such conditions.

There are major discrepancies in the testimony as to the existing weather conditions, particularly with reference to the presence of haze or fog, which the Coast Guard crew contend caused visibility to be reduced to approximately one mile and which the crew on the tug deny played any significant role in the casualty. This Court does not find that the weather conditions are a controlling factor, since it is conceded that visibility was sufficient to enable the helmsman on each vessel to observe the running lights on the other. Discrepancies further exist as to the fatigued condition of the Coast Guard crew, as to the necessity for and custom of employing lookouts, and as to the expertise and navigational knowledge of the tug's helmsman. This Court, in finding certain facts to exist, has necessarily weighed with considerable care the credibility of the witnesses and the conflicting evidence and gleaned the most believable and relevant testimony from the record in order to reconstruct as completely as possible the circumstances surrounding the collision. The following would seem to reflect most accurately what actually occurred during the early morning hours of April 2, 1968.

Relief Captain Stapp was at the helm of the MARY E. STAPP, and he had maneuvered the flotilla into mid-channel as he proceeded inbound toward Corpus Christi. However, in view of the brisk southeast wind off the port quarter which significantly affected the handling of the tow, the barges were sufficiently angled into the wind so that the bow of the lead barge extended across the center line onto the port side of the channel. In short, the unitized tug and tow were "crabbing" as they proceeded in the channel prior to the collision. No lookout was posted on either tug or tow, and the MARY E. STAPP was not using its radio or radar at the time. No passing signals, fog signals or other signals were sounded by the tug at any time. The towing unit was approximately 800 feet in length, the lead barge being the empty CC–422, followed by one partially loaded and two fully loaded barges. The tug, owned by Stapp Towing Company, is a one-thousand horsepower diesel powered towing vessel with a length of 58 feet and a gross tonnage of 1200 tons.

The foredeck of the empty lead barge CC–422 had approximately a ten to twelve foot freeboard, with the rake end angled upward toward the bow. The port and starboard running lights and the amber center light were battery powered Percolights, which were secured respectively to the foremost towing but-

tons on the port and starboard sides of the barge with the center light attached to a vertical pole aft of the bow. The side lights, placed approximately eighteen inches inboard, and the amber light, placed three to four feet from the stem, were necessarily positioned on the slanted deck at the rake.[2] The location of these lights, combined with the high freeboard of the lead barge at the bow, diminished their effective range and actually rendered the lights invisible when in close proximity to an approaching vessel of the small size and low freeboard of the CG–40459.

The United States Coast Guard CG–40459, a forty foot utility boat powered by two 220 horsepower diesel engines, was proceeding outbound from Corpus Christi at a speed of approximately 8 to 10 knots and holding close to midchannel. The wind was blowing from the southeast toward shore at approximately 15 to 20 knots, and, consequently, visibility for the Coast Guard crew including the helmsman was partially obscured by the resulting spray. Upon observing the lights of the tug, the helmsman of the CG–40459 altered his course to starboard, intending to make a port to port passing, but he did not signify such intention by sounding any whistle signal. Neither did he reduce speed. He observed the towing standard on the tug with its two vertical white lights at a distance of some 200 yards which properly indicated that the tug was pushing barges, but he conceded that he failed to understand their meaning.

From the above findings of fact, it is apparent that this collision is one in which both vessels must share the blame. Such departures from prudent conduct are readily related to applicable legal principles which control the result in this case and compel the assessment of mutual fault against the tug and the CG–40459.

As for the MARY E. STAPP, this Court finds as a significant contributing factor the failure of the tug personnel to place running lights in proper position on the lead barge so as to be visible at all times to an approaching vessel, especially one of the size and freeboard of Coast Guard utility boat CG–40459. This failure is a statutory fault in violation of Inland Rules, Section 80.16a. The lead barge actually was equipped with fixed metal poles at the rake end which were designed to support running lights at a sufficient height above the deck to alleviate this very problem. These fixtures were not used. *See, e. g.,* Horton & Horton, Inc. v. S/S ROBERT E. HOPKINS, 269 F.2d 914 (5th Cir. 1959), cert. denied 361 U.S. 961, 80 S.Ct. 589, 4 L.Ed.2d 543 (1960); The ELMHURST, 78 F.2d 536 (2d Cir. 1935) (cases in which tug held responsible for improper lights of tow.)

The Inland Rules, Art. 18, Rule I, establishes the duty of a vessel to pass port to port in normal circumstances when meeting head to head, and to signify such intent by a one whistle signal. Additionally, Inland Rules, Art. 25, known as the narrow channel rule provides that vessels should keep to the starboard side of narrow channels to circumvent the risks which were so dramatically realized in the instant case. These were violated by the MARY E. STAPP and constitute statutory faults proximately related to the collision.

This Court has examined the chart in evidence which identifies the site of the collision and has taken notice of the fact that Relief Captain William Stapp, helmsman of the tug, is a seaman of some 30 years experience in the Corpus Christi Bay area. The location of the collision near buoys 74 and 75 is bounded on the southern side of the channel by large and extremely shallow spoil areas. Taking into consideration the existing circumstances, it is highly un-

---

2. The testimony of Bruce Stapp conflicts with this finding, in that Mr. Stapp testified that all lights on the lead barge were within inches of the furthermost starboard, port and center points of the bow. This version has been considered and rejected by the Court.

likely in the opinion of this Court that a man of Stapp's experience should have seen the lights of the outbound 40 foot CG–40459 and concluded that the vessel was crossing the channel to thread its way through a spoil area in the dark with the serious attendant risk of grounding. A more feasible explanation which is persuasive to this Court is that the angle of Relief Captain Stapp's line of vision as he viewed the CG–40459 was significantly increased by the "crabbing" to port of the tug and tow in order to compensate for the brisk wind out of the southeast. This factor, combined with the course change to starboard of the CG–40459, would have caused an approaching vessel to appear to be proceeding at an angle across the channel to the port side when viewed from the tug, thus obscuring from view the starboard running light of the oncoming vessel.

■ There are numerous cases in which the duties of vessels relating to a crossing situation as opposed to a meeting situation are examined; *see, e. g.,* Albert Dumois, 177 U.S. 240, 20 S.Ct. 595, 44 L.Ed. 751 (1900); The Amolco, 283 F. 890 (1st Cir. 1922); Harbor Towing Corp. v. Tug RELIANCE, 211 F.Supp. 896 (E.D.Va.1963); J. Griffin, Collision § 28 at 63–64 (1949). Although the captain of the tug testified that he saw only the port sidelight and the two white range lights of the CG–40459, the combination of circumstances clearly should have placed him on notice that a meeting situation might well be imminent. It is the risk of collision, not the collision itself, that masters must avoid, Lady Nelson, Ltd. v. Creole Petroleum Corp., 224 F.2d 591 (2d Cir. 1955), cert. denied, 350 U.S. 935, 76 S.Ct. 308, 100 L.Ed. 817 (1956). The Court thus finds a lack of prudent seamanship on the part of the tug's captain. In all probability there would have been sufficient time in which to sound proper signals and take successful evasive action, had ordinary care been exercised by the MARY E. STAPP's helmsman.

Equally as indicting is the failure of the Coast Guard crew on the CG–40459 to recognize the significance of the lights on the towing standard of the MARY E. STAPP. Had they been properly schooled that the concededly visible two vertical white lights indicated that the tug was pushing barges ahead, pursuant to Art. 3 of the Inland Rules, and had they further known that the Inland Rules permit barges in tandem to extend to five vessel lengths, Section 84.05(a), those on the CG–40459 would have been amply alerted to the potential character of the tow being met in the dark and the attendant risk of collision. Additionally, had the CG–40459 reduced speed which prudence required so as to diminish the effect of spray over the bow as it proceeded outbound in the somewhat choppy seas, its increasingly hazardous position vis-a-vis the approaching tug and tow might have become evident to those on board in sufficient time so that appropriate avoiding maneuvers could have been successfully undertaken. Last of all, the Coast Guard craft was equally as guilty as the tug in failing to sound appropriate whistle signals under the circumstances in violation of Inland Rules, Art. 18, Rules I and III.

■ In view of the positions urged by the parties as to the legal significance of a statutory violation, a few observations are perhaps appropriate. Statutory fault, that is, the breach of one of the rules of navigation or other statutory authority, invokes in admiralty the Pennsylvania Doctrine, The Pennsylvania, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874). The Rule was originally stated as follows:

> But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her faults might not have

been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute.

The Court of Appeals for the Fifth Circuit's interpretation of the Pennsylvania Rule has been somewhat less stringent than the original formulation and is less a rule of liability than a rule of shifting the burden of proof of causation, Green v. Crow, 243 F.2d 401 (5th Cir. 1957). *See* Parker Bros. & Co. v. De Forest, 221 F.2d 377 (5th Cir. 1955) and Compania De Maderas De Caibarien, S.A. v. The QUEENSTON HEIGHTS, 220 F.2d 120 (5th Cir. 1955). In the QUEENSTON HEIGHTS, the Fifth Circuit held that the Pennsylvania Doctrine did not "establish a hard and fast rule that every vessel guilty of a statutory fault has the burden of establishing that its fault could not by any stretch of the imagination have had any causal relation to the collision . . . ." *Id.* at 122. *Accord:* China Union Lines, Ltd. v. A. O. Andersen & Co., 364 F.2d 769 (5th Cir. 1966) cert. denied, 386 U.S. 933, 87 S.Ct. 955, 17 L.Ed.2d 805 (1967). This common sense approach can be important in instances in which the circumstances of the casualty warrant application of the major-minor fault rule and yet the derelictions of each vessel include a statutory violation. In Koch-Ellis Marine Contractors, Inc. v. Chemical Barge Lines, Inc., 224 F.2d 115 (5th Cir. 1955), a per curiam decision, the Court held that the Pennsylvania Rule could be superseded in cases in which the major-minor fault rule was found to be applicable. Thus, the Rule, as applied in this Circuit, imposes more of a test of what is reasonably required by a particular statute as opposed to speculation and conjecture and does not rigidly presume a finding of mutual fault when the statutory error committed by one vessel can be realistically viewed by a Court as non-contributory to the causes of the collision.

■ Although earnestly contended for, neither party in this case can become a beneficiary of such a dispensation. The evidence compels this Court to conclude that both the MARY E. STAPP and the CG–40459 have failed to meet the burden imposed upon them by the Rules of proving that their respective statutory violations were causally unrelated to the casualty. These as well as the non-statutory violations heretofore pointed out were grievous and significant in nature, and, when they are assessed in the light of the circumstances in question, it is apparent that the equities are most accurately reflected by a finding that both vessels are to blame. Accordingly, this Court holds that the collision was brought about by the mutual fault of the CG–40459 and the M/V MARY E. STAPP, and that the amount stipulated as damages resulting from the collision should be equally borne by the parties, Caradelis v. Refineria Panama, S.A., 384 F.2d 589 (5th Cir. 1967) ; Arctic Shipping Corp. v. Gulfcoast Transit Co., 333 F.2d 605 (5th Cir. 1964).

■■ The Court further finds that the tow being pushed by the MARY E. STAPP displayed improper lights in violation of the provisions of Section 80.16 a(b), (i), (j), (k), and (l) of the Inland Rules in that the running lights of the lead barge were improperly placed, improperly screened and were at times partially or totally obscured or obstructed. Title 33 of the United States Code § 159 provides:

Every vessel which is navigated in violation of any of the provisions of this chapter or the regulations established pursuant hereto shall be liable to a penalty of $500, one-half to go to the informer, for which sum such vessel may be seized and proceeded against by action in any district court of the United States having jurisdiction of the offense.

It is clear to this Court that an *in rem* action brought to recover penalties such as those imposed by § 159 is dependent neither upon a preliminary adjudication

of personal guilt, United States v. The RUTH MILDRED, 286 U.S. 67, 52 S.Ct. 473, 76 L.Ed. 981 (1932), nor upon exhaustion of administrative remedies, *cf.* United States v. Anchor Line, Ltd., 257 F.Supp. 99 (S.D.N.Y.1965). The Court is not persuaded that the government is limited in its claim to one-half of the penalty amount because, as defendant urges, the remaining half may be claimed only by an informer pursuant to the "informer's fee" provision in 33 U.S.C. § 159. The allowance or disallowance of this fee is a matter to be resolved between that person claiming "first informer's status" and the government. Lack of such a claim does not act as a partial defense to the liability of the violator.

The Code is silent as to what constitutes a separate offense or violation, and thus what total penalty should be imposed for multiple violations. The government urges the imposition of the $500 penalty for each separate insufficiency as to each light placed aboard the lead barge of the MARY E. STAPP's tow. The defendant, while initially denying any violation, would urge that the incident should be viewed in its entirety as one composite offense warranting imposition of one $500 penalty, regardless of the number of technical violations. There are no cases treating the proper construction of § 159 in this regard. Consequently, as to this statutory breach this Court attempts to supply a realistic construction which recognizes the congressional awareness of a need for pecuniary penalties to discourage such violations without making such a construction unduly oppressive. Accordingly, the Court finds the MARY E. STAPP to be guilty of three separate violations, in that each of the three running lights placed aboard the lead barge violated one or more of the regulations cited above. The total penalty to be imposed against the tug *in rem* is therefore $1,500.

The above constitute the Findings of Fact and Conclusions of Law of this Court.