[No. 44528. En Banc. May 5, 1977.]

WAYNE R. BEESON, *Respondent,* v. ATLANTIC–
RICHFIELD COMPANY, *Appellant.*

500

*Perkins, Coie, Stone, Olsen & Williams,* by *Lee Miller* and *Theodore J. Collins,* for appellant.

*Moriarty, Long, Mikkelborg & Broz, Charles E. Yates,* and *Henry Haugen,* for respondent.

*Thomas J. McKey* and *David B. Anderson* on behalf of Northwest Towboat Association, amici curiae.

STAFFORD, J.—The trial court entered judgment in favor of plaintiff–respondent Wayne Beeson for the value of his gill net found to have been damaged by defendant–appellant's ship. Defendant appeals. We affirm.

Appellant Atlantic–Richfield Company (Arco) owned and operated the supertanker *Atlantic Endeavor* (Endeavor). On July 21, 1974, Puget Sound Pilot Captain Lindholm boarded Endeavor at Port Angeles. The ship entered the traffic lanes of the United States Coast Guard's voluntary Vessel Traffic System (VTS)[1] en route to the Arco refinery at Cherry Point.

Captain Lindholm recommended that Endeavor go by way of Haro Strait, a deeper, wider, more easily navigated route than Rosario Strait. The suggested route would also enable the vessel to avoid a large concentration of fishing boats, with their gill nets down, known by Captain Lindholm to be in Rosario Strait near McArthur Bank.

[1]The voluntary Vessel Traffic System consisted of inbound and outbound traffic lanes, each 1,000 yards wide, separated by a 500–yard traffic separation zone.

Based on Arco's policy of following the voluntary VTS traffic lanes recommended by the Coast Guard, the master, Captain Bristow, rejected Captain Lindholm's suggestion and directed the ship to continue into the northbound or inbound voluntary traffic lane and proceed through Rosario Strait.

The weather was clear, visibility was good, and there was adequate daylight as Endeavor neared McArthur Bank where she encountered what was variously estimated as between 100 and 500 gill–netters with their nets down. Some were located in the northbound lane. Captain Bristow attempted to maneuver Endeavor through the boats and nets by giving whistle signals, changing course, reducing speed, and going astern. In the course of maneuvering to avoid gill–netters in the northbound lane, Endeavor veered to port and ran through respondent's gill net which was located in the southbound or outbound voluntary traffic lane. At the time respondent's net was hit, it was extended approximately 600 yards, marked by a buoy at the end away from his fishing vessel.

After running through nets in both the north– and southbound lanes, Captain Bristow concluded that he could not continue through Rosario Strait without doing further damage. He ordered Endeavor to come about and continue the voyage to Cherry Point by Haro Strait, the route originally recommended by Captain Lindholm.

Respondent sued Arco unsuccessfully in Seattle District Court for the value of his gill net. He appealed and obtained a trial de novo in Superior Court where he was awarded $1,000 for the value of his damaged net and $3,600 for reasonable attorney's fees. Arco appealed, and the case was certified to this court by the Court of Appeals.

Appellant Arco first assigns error to the trial court's finding of fact No. 6 that Endeavor struck respondent's gill net in the southbound rather than in the northbound lane. Appellant contends there is not substantial evidence to support the finding. We do not agree.

When a trial court has based its finding of fact on conflicting evidence and there is substantial evidence to support it, an appellate court will not substitute its judgment for that of the trial court even though it might have resolved the factual dispute differently. *Hansen, Inc. v. Pacific Int'l Corp.*, 76 Wn.2d 220, 227, 455 P.2d 946 (1969). Substantial evidence is said to exist if there is sufficient evidence to persuade a fair–minded, rational person of the truth of the declared premise. *In re Snyder*, 85 Wn.2d 182, 185–86, 532 P.2d 278 (1975); *see also Reynolds Metals Co. v. Electric Smith Constr. & Equip. Co.*, 4 Wn. App. 695, 698, 483 P.2d 880 (1971).

It is undisputed that Endeavor ran over at least three gill nets, the first at 2039 hours (8:39 p.m.) in the northbound lane. Captain Bristow estimated that his vessel was near the separation zone when he backed into a second net and that the "third one may have been in the southbound lane, when I was heading south . . . at the time we were trying to turn the ship around." Captain Lindholm, the pilot, acknowledged that during the maneuver of coming about to exit Rosario Strait it was quite possible Endeavor *could have gotten out of the southbound lane as far northwesterly as the vicinity of McArthur Bank.*

Respondent's net was not the first cut because upon retrieving it after the accident, pieces of another net, not his own, were found entangled therein. No one testified that Endeavor backed into respondent's net. Thus, respondent's net must have been at least the third one severed by Endeavor, at some time later than 2039 hours.

This coincides with respondent's observation. Mr. Beeson saw Endeavor proceeding on a straight course the better part of a mile to the south of him. Then, Endeavor veered sharply to port setting a course directly into his net. Respondent estimated the time of collision as a few minutes prior to 2100 hours (9:00 p.m.), 15 or 20 minutes after Endeavor ran over the first net in the northbound lane.

There is substantial evidence to support finding of fact No. 6. The foregoing evidence is sufficient to persuade a

fair–minded, rational person that respondent's vessel and net were located in the southbound lane at the time of the collision. The trial court's resolution of conflicting testimony in favor of respondent was based on substantial evidence, and we will not disturb it on review.

Appellant also challenges a portion of finding of fact No. 7 which determines that while some gill–netters obstructed the northbound lane, respondent did not, and that respondent had no reason to assume Endeavor, proceeding in the northbound lane, was going to veer sharply into the southbound lane in the vicinity of his net. A review of the statement of facts convinces us that there is substantial evidence to support the challenged finding of fact.

Appellant also argues that this finding of fact is erroneous because Endeavor cut respondent's net while maneuvering to avoid gill–netters in the *northbound lane;* and therefore the other gill–netters, rather than Arco, were responsible for the collision in the *southbound lane.* We do not agree. The presence of gill–netters in the northbound lane may have increased the complexity of the navigation problem. But, none of the other fishermen is a party to this action, and there is no evidence that any was fishing with or connected in any way with respondent. Appellant Arco cannot, in this manner, avoid responsibility for the maneuvering of its ship.

Appellant next asserts that the traffic separation scheme of the VTS, composed of the north– and southbound lanes and the traffic separation zone, is a marine "fairway" within the meaning of Article 26 of the Inland Rules of the Road.[2] Arco contends that the setting of respondent's net at any point within the entire area would be an obstruction to navigation prohibited by Article 26 of the Inland Rules.

---

[2]Article 26 of the Inland Rules of the Road, 33 U.S.C. § 211 (1957), provides:
"Sailing vessels under way shall keep out of the way of sailing vessels or boats fishing with nets, or lines, or trawls. This section shall not give to any vessel or boat engaged in fishing the right of obstructing a fairway used by vessels other than fishing vessels or boats."

Thus, it is argued, respondent was the sole proximate cause of his own damage for having set his gill net in *either* the north– or southbound lanes, *i.e.*, for having obstructed the "fairway."

In essence, Arco invites us to rule that the traffic lanes and separation zone of the Puget Sound voluntary VTS was a marine "fairway" at the time of the incident and that gill nets set at any point within the lanes of the VTS were an obstruction to navigation of a merchant vessel proceeding in either lane thereof. We decline the invitation.

On July 21, 1974, the date of the accident, the VTS was merely a voluntary experimental system instituted by the Coast Guard. Therefore, we make no ruling in regard to the status of these voluntary traffic lanes and their relation to the Inland Rules of the Road at that time.[3] On September 30, 1974, 2 months after Endeavor had run through respondent's net, the Coast Guard made the VTS mandatory. 39 Fed. Reg. .25430 (1974), effective date September 30, 1974. *See also* 33 C.F.R. § 161.101 through § 161.189 (1976). The new Coast Guard Operating Manual, unlike the one in effect at the time of the accident, refers for the first time to the traffic lanes as "fairways to which Article 26 applies." Appellant claims navigational rights under that mandatory system. We decline the invitation to discuss or rule on any portion of 39 Fed. Reg. 25430, 33 C.F.R. § 161.101–.189, the Coast Guard Operating Manual or any navigation chart adopted subsequent to the July collision. The application of the mandatory VTS to the rights or duties of the parties under Article 26 is irrelevant to the case at hand.

■ We do hold, however, that the portion of the voluntary VTS with which we were here concerned, lying within

---

[3]Insofar as navigation and fishing rights are concerned, under Article 26, we attached no legal significance to the voluntary VTS or the voluntary Traffic Separation Scheme overlayed upon C&GS Chart 6380, dated March 2, 1974. Nevertheless, we have heretofore and shall hereafter refer to the inbound or northbound lane and the outbound or southbound lane of the voluntary system solely for the purpose of clarity in designating the position of vessels and gill nets as well as courses and distances.

an open navigable passage habitually used by vessels, falls within the definition of a marine "fairway" as that term is used in Article 26 of the Inland Rules of the Road. *See Johnnsson v. American Tug Boat Co.,* 85 Wash. 212, 215–16, 147 P. 1147 (1915). Thus, Rosario Strait is a marine "fairway" to which Article 26 applies without regard to the voluntary VTS in effect at the time of the accident.

 Considering Article 26 in this light, and confined to the facts and data of this incident, we are not convinced that a gill net ipso facto obstructs a marine "fairway" by the mere fact of being placed within the outer confines of that "fairway." While it may be unwise to set gill nets on or near the usual and proper course frequented by vessels, Article 26 does not forbid such an act. Nevertheless, common sense requires that a fisherman consider the surrounding circumstances such as visibility, the width of the "fairway," and the proximity of his boat to the area being traversed by other vessels. A fishing vessel does not obstruct a "fairway" under Article 26 unless a moving vessel cannot pass safely without undertaking an unusual or dangerous maneuver. *See The Bright,* 38 F. Supp. 574 (D. Md. 1941).

In the instant case respondent's boat and net did not obstruct any part of the "fairway" insofar as Endeavor's inbound progress was concerned. Consequently, Article 26 does not exonerate Endeavor from the trial court's determination of negligent navigation.

Appellant Arco agrees with the first part of the trial court's finding of fact No. 8 which states that a vessel finding her way obstructed by gill nets may signal for a path to be cleared by sounding one long and one short whistle, 33 C.F.R. § 206.93 (1976).[4] But Arco assigns error to the latter part of the finding which interprets the regulation:

---

[4]33 C.F.R. § 206.93 (1976) "Puget Sound Area, Wash.; gill nets.

"(a) *Restricted fishing area.* (1) The regulations in this paragraph shall govern fishing with gill nets within the waters of Puget Sound . . . Strait of Juan de Fuca, San Juan Archipelago . . . Rosario Strait . . .

"(2) A tug with tow, whose intended course will take it through waters occupied by gill net gear, shall sound one long blast, followed by one short blast, of a whistle or horn . . . Gill net fishermen operating *within the indicated course of*

This does not establish a right to proceed, but rather requires the allowance of reasonable time for nets to be drawn in. No such time was allowed the plaintiff.

Appellant argues that this interpretation is an infringement upon its superior right of navigation under Article 26. Shipowners, it is contended, should not be required to wait until gill–netters retrieve their nets from the traffic lanes. Rather, where the right of navigation and the right of fishing conflict, the subservient right of fishing must yield. Appellant goes so far as to contend that:

While the master of the ATLANTIC ENDEAVOR elected to turn around rather than cut 500 nets, from a strictly legal standpoint he need not have done so. If the Captain had elected to exercise his right of navigation to the hilt, the vessel could have proceeded to cut nets on the basis that such were reasonably necessary to the furtherance of the voyage.

■ Appellant claims too much. Arco fails to recognize that the Inland Rules of the Road in general and Article 26 in particular, as well as 33 C.F.R. § 206.93, are rules of common sense. Although Article 26 of the Inland Rules gives the right of navigation superiority over the right to fish, within that portion of the "fairway" actually being traversed by vessels other than fishing vessels, it does not extinguish the right of fishing. When the two rights conflict, the right of fishery must yield to "the *fair, useful and legitimate exercise of the right of navigation." Anderson v. Columbia Contract Co.,* 94 Ore. 171, 182, 184 P. 240, 185 P.

*the tug* shall draw in their gear or otherwise maneuver to permit passage of the tug and its tow *without hindrance or unreasonable delay.*

"(3) A tug without tow or any other vessel, if unable to determine the lay of the nets and doubt exists aboard the tug or vessel as to the best course to take, may request assistance of the nearest gill net boat which shall, without delay, drop its net and pilot the tug or vessel through. If assistance of a pilot boat is not obtainable or if nets are so concentrated as to make it impracticable to lay a course through the nets, the tug or vessel shall proceed as indicated in subparagraph (2) of this paragraph for a tug with tow, and nets shall be lifted or maneuvered out of the way to permit passage of the tug or vessel *without hindrance or unreasonable delay."* (Italics ours.)

508

231 (1919). The superior right of navigation must be exercised with *reason.* As pointed out in *Anderson* at page 183:

> While a boat may "take her course" nevertheless a *navigator cannot with impunity do unnecessary damage* to a fisherman or his property; but upon the contrary *the paramount right of navigation must be exercised* fairly, and not arbitrarily, and *with due regard to the subordinate right* of fishery and a *boat must be so navigated as not to do unnecessary damage . . .*

(Italics ours.) *See also Horst v. Columbia Contract Co.,* 89 Ore. 344, 174 P. 161 (1918). There is no absolute right of navigation that permits a vessel to claim a right–of–way to proceed into an unnecessary collision. *See The Non Pareille,* 33 F. 524 (S.D.N.Y. 1887); *Horst v. Columbia Contract Co., supra.*

Similarly, 33 C.F.R. § 206.93(3), interpreted in this commonsense manner, does create a right to proceed immediately upon giving the required whistle blasts. The regulation does not contemplate that a navigator may proceed with impunity through gill nets obstructing his path. Rather, the regulation provides that the gill net fisherman *"operating within the indicated course"*[5] shall lift or maneuver his nets out of the way "to permit passage . . . *without hindrance* or *unreasonable* delay." 33 C.F.R. § 206.93(2), (3). This language clearly requires that fishermen within a moving vessel's "indicated course" be allowed a reasonable amount of time to lift or maneuver their nets so as to permit unhindered passage by the moving vessel, because the rule speaks in terms of permitting passage without *unreasonable* delay. Instead of giving the gill–netters in Endeavor's "indicated course" a reasonable time to lift or maneuver their nets out of the way, Endeavor's master continued on course, with attempted maneuvering,

[5] Our citation to and discussion of 33 C.F.R. § 206.93(2) insofar as it pertains to "[a] tug with tow," is not intended as a declaration of the rights of either tugs with tow or gill–netters. There are no facts in this case that bring the rights of a tug with tow into conflict with the rights of gill–netters. The foregoing citation is used and discussed only insofar as it relates, by reference to 33 C.F.R. § 206.93(3), *i.e.,* "[a] tug without tow or any other vessel."

until he found himself in an impossible navigational situation. Arco's assignment of error in regard to 33 C.F.R. § 206.93 is therefore without merit.

Parenthetically, it should be added that when Endeavor's whistle was sounded to signal the gill–netters in her *northbound* "indicated course" the signal could have had no logical meaning for respondent who was fishing in the *southbound* lane. Respondent was not within Endeavor's "indicated course." He was in an unrelated part of the "fairway." Thus, the whistle signal, whether heard or not, established no rights of navigation in appellant and imposed no duty upon respondent under 33 C.F.R. § 206.93(2), (3).

■ Appellant also assigns error to the trial court's conclusion of law holding Arco liable for negligent navigation. Reviewing the navigational situation of Endeavor shortly before the ship cut respondent's gill net, there are some helpful guidelines. First, negligence is the failure to exercise reasonable and ordinary care. *Gordon v. Deer Park School Dist. 414,* 71 Wn.2d 119, 122, 426 P.2d 824 (1967). Second, at sea the duty of prudent seamanship and careful navigation is on the captain of the vessel who must stop his engines in the presence of danger or anticipated danger. *Lehigh Valley R.R. v. The Tug Blackjack 21,* 208 F. Supp. 648 (S.D.N.Y. 1962). *See also The New York,* 175 U.S. 187, 44 L. Ed. 126, 20 S. Ct. 67 (1899); *Moran Scow Corp. v. S.S. Boston,* 342 F. Supp. 216, 238 (S.D.N.Y. 1972). In fact, masters must avoid the *risk* of collision, not the collision itself, by taking successful evasive action. *United States v. M/V Mary E. Stapp,* 335 F. Supp. 975 (S.D. Tex. 1971). With the foregoing principles in mind, we have reviewed the record and agree with the trial court that Captain Bristow did not meet his burden of reasonable care. Rather, he let his ship proceed into a position of danger with a large number of gill–netters fishing in the *northbound* lane. This act ultimately brought Endeavor into collision with respondent's gill net in the *southbound* lane.

Captain Bristow knew from Captain Lindholm there would be a large concentration of gill–netters approximately where he found them in Rosario Strait. The boats and nets appeared as a large mass on Endeavor's radar screen about 2 miles away. Although Captain Bristow had not experienced such a situation before and had no knowledge of the problems a supertanker would have threading its way through a large number of gill nets, he did not ask Captain Lindholm for further information about the nearing hazard, despite the fact that Captain Lindholm was aboard as a local pilot to assist the master with his knowledge of local navigation. Captain Bristow's attitude toward the problem is evidenced by his statement that Captain Lindholm should not worry about the nets because Arco would pay for any damage.

A chronology of events recreated from Endeavor's Log Book, Bell Book, Course Recorder, and Pilot's Accident Report indicates that at 2032 1/2 hours (8:32 1/2 p.m.) Endeavor was maneuvering with the engines on standby. However, she was still moving ahead at a speed of about 14 1/2 knots. At 2034 hours, ahead half was signaled and ahead slow at 2037 1/2 hours, while still maneuvering. The speed had dropped to approximately 11 knots. According to Captain Bristow, the first gill net was cut at 2039 hours (8:39 p.m.). It was not until then that he first signaled to stop the engines. At the time Endeavor was still moving at approximately 9 1/2 knots and was well into the cluster of fishing boats and gill nets. The signal for full astern was given at 2040 hours and again at 2042 hours. By that time the second net had been cut. Captain Bristow's actions at this point are more than sufficient to support the trial court's determination of negligence.

■ Captain Bristow then attempted to extricate Endeavor from the gill nets by bringing her about. In the process of that maneuver, Endeavor ran through respondent's net in the southbound lane. A navigator may not, by his own negligence, unnecessarily force the right of navigation and the right of fishing into conflict and then claim the

benefit of the paramount right. *See Agger v. The Beatrice & Rose,* 84 F. Supp. 761 (D. Me. 1949); *Wright v. Mulvaney,* 78 Wis. 89, 46 N.W. 1045 (1890).

■ Respondent had 600 yards of gill net out, resulting in little freedom of movement. His boat and net were not unlike an anchored vessel. Therefore the rules pertaining to anchored vessels are helpful to our inquiry into the negligent navigation of Endeavor. When a moving ship collides with an anchored vessel, there is general presumption of negligence on the part of the former. *Standard Dredging Corp. v. S.S. Syra,* 290 F. Supp. 260 (D. Md. 1968); *Al Johnson Constr. Co. v. S.S. Rio Orinoco,* 249 F. Supp. 182 (E.D. Pa. 1965); *Sun Oil Co. v. S.S. Georgel,* 245 F. Supp. 537 (S.D.N.Y. 1965); *Petition of United States Dredging Corp.,* 225 F. Supp. 730 (E.D.N.Y. 1964). The vessel in motion must exonerate herself by showing it was not within her power to prevent the collision by adopting any practical precautions. *Al Johnson Constr. Co. v. S.S. Rio Orinoco, supra; Sun Oil Co. v. S.S. Georgel, supra; Petition of United States Dredging Corp., supra.*

Appellant has not met its burden of prudent seamanship in regard to any of the previously discussed principles of navigation. The trial court was correct in ruling that respondent's net was damaged by reason of the negligent navigation of Endeavor.

Finally, appellant contends that because the amount in controversy was only $1,000, the trial court's award of $3,600 for attorney's fees is unreasonable. The record, the witnesses called, and the extensive briefs make it abundantly clear that neither party treated this action as a $1,000 lawsuit. Rather, both parties spent considerable time preparing the case, and the subsequent appeal, as a potential test case.

■ Among the many factors to be considered in determining the reasonable value of attorney's fees are the time expended, the difficulty of the questions involved, and the skill required. *Dailey v. Testone,* 72 Wn.2d 662, 664, 435 P.2d 24 (1967). The trial court considered these factors in

making its award. The amount is reasonable under the circumstances.

The trial court is affirmed as to all assignments of error. The matter is remanded for the sole purpose of determining the reasonable value of attorney's fees on appeal.

WRIGHT, C.J., and ROSELLINI, HAMILTON, UTTER, BRACHTENBACH, HOROWITZ, DOLLIVER, and HICKS, JJ., concur.

Petition for rehearing denied July 1, 1977.