[No. 4055–2.   Division Two.   December 20, 1979.]

THE STATE OF WASHINGTON, *Appellant,* v. ALFRED
R. HAMILTON, ET AL, *Respondents.*

*Slade Gorton, Attorney General,* and *Walter S. Tabler, Assistant,* for appellant.

*J. M. Cunningham* and *Cunningham & Agnew,* for re-spondents.

PEARSON, C.J.—This appeal by the State of Washington presents the issue whether the Scenic Vistas Act of 1971, RCW 47.42, requires removal of a large sign, located near the Interstate 5 freeway in Lewis County, which is used to display political and religious commentary. The State also contends the trial court unduly restricted its efforts at discovery. We find no reversible error and affirm the dismissal of the State's complaint for removal of the sign as an alleged public nuisance.

Mr. and Mrs. Alfred R. Hamilton own a farm of about 200 acres adjacent to the Interstate 5 freeway between Centralia and Chehalis. They lease other acreage. They raise cattle, corn, grain, peas, and hay. They sell these products and have some drop–in trade. On the farm they erected a large, V–shaped signboard with its two surfaces visible and legible to northbound and southbound traffic on I–5. Each surface consists of a rectangle about 41 by 13 feet

in area, with a large, colored cutout picture of Uncle Sam occupying about one-third of the surface. Next to Uncle Sam is a white readerboard, by far the largest area of the structure, which defendants use to display a variety of messages formed by removable letters. The white reader-board has a blue border, and in the border is written along the top in white letters the words "Hamilton's 7+," and on the bottom "Angus-Holstein Springers." Testimony established that a "springer" is a heifer that is about to drop a calf. Mr. Hamilton indicated in his deposition that "7+" is the registered brand for his livestock. Above each main rectangular signface is attached a much smaller sign saying "Access Road Next Exit" above one surface, and "Access Road 2nd Exit" above the other surface. Topping each signface is another small sign reading "Hamilton Farms."[1] By actual measurement, the main signs, consisting of Uncle Sam, the readerboard area, and the border, are each about 560 square feet. The attached exit direction signs are each about 29 square feet. The uppermost "Hamilton Farms" signs are about 20 by 2.4 feet, or roughly 50 square feet. The signs are lighted at night.

Mr. Hamilton changes the messages displayed on the readerboard frequently, and the great majority of them state his own political views or comments suggested to him by acquaintances. Following are but a few examples of the messages during the years 1975-1977:

Gun Control is a step toward "people control"
Sign Initiative 309. Repeal Shorelines Management Act
There are no billboards in Russia or Red China
Don't give canal to Panama. Give them Kissinger
Should we trust computer balloting?
What price environmentalism?
Carter's new broom is made of old straw
U. S. Canal Zone today. Alaska or Louisiana tomorrow?

---

[1]The sign once included a reference to turkeys, when they were raised on the farm in great numbers.

Women are meant to be cherished not liberated

Get U.S. out of the United Nations

Comparatively few other messages had a more neutral patriotic flavor, were religious in content, or advertised local activities, *e.g.*:

Let's keep Christ in Christmas

Barbershop Harmony R.E. Bennett School March 14 and 15

Thank God for His gift to thy bounty

God bless America on her 200th Birthday

Be thankful that you are in America

We wish you a Happy New Year

The principal issue in this appeal is whether the Hamiltons' sign is prohibited by the Scenic Vistas Act because it is visible from the interstate freeway. RCW 47.42.030 prohibits any person from erecting or maintaining a sign that is "visible from the main traveled way of the interstate system". RCW 47.42.040 states the exceptions to the general prohibition.

> 47.42.040 Permissible signs classified. It is declared to be the policy of the state that no signs which are visible from the main traveled way of the interstate system, primary system, or scenic system shall be erected or maintained except the following types:
>
> (1) Directional or other official signs or notices that are required or authorized by law;
>
> (2) Signs advertising the sale or lease of the property upon which they are located;
>
> (3) *Signs advertising activities conducted on the property on which they are located*;

(Italics ours.)

The State argues that section (3) of the statute, italicized above, must be interpreted so that only signs with the *primary* purpose of advertising on–premises activities can fall within the exception. Otherwise, the argument goes, the Scenic Vistas Act will be undermined because any business could advertise its product on property along a protected highway, simply by making an incidental reference to a related activity conducted on the property on which the

sign was located. The example is given of liquor manufacturers advertising their product at a diner located beside a protected highway simply by making some reference to the diner. The State points out that of the total area of about 640 square feet on each face of the billboard, the only portions directly relating to the Hamiltons' farming activities are the 80 square feet devoted to the words "Hamilton Farms" and the freeway exit directions, in addition to the lettering in the narrow border of the readerboard and its Uncle Sam caricature. Moreover, among the nearly 100 different messages observed and photographed by the State and introduced at trial, some of which are listed above, only 2 had any connection with agricultural activities on the Hamiltons' farm—and even those had political overtones:

Non–communist straw for sale

Non–red or pink springer for sale

From this evidence, the State concludes that the trial court erred in its findings of fact and conclusions of law to the effect that the billboard's purpose is to advertise the farm and its products and that it fits within the statutory authorization for such signs.

■■ An appellate court will not overturn a trial court's findings of fact supported by substantial evidence, even if there is conflicting evidence in the record and the appellate court might have resolved the factual dispute differently; "substantial evidence" is of a kind sufficient to persuade a fair–minded, rational person of the truth of the declared premise. *Beeson v. Atlantic–Richfield Co.,* 88 Wn.2d 499, 503, 563 P.2d 822 (1977).

In this case, both the trial judge and an advisory jury sworn pursuant to CR 39(c) found that the purpose of the sign was to advertise the activities on the Hamilton farm. The findings were supported by the testimony of Alfred Hamilton himself; George Zamberlin, a sign manufacturing company officer; and Jesus Flores, a farm employee who helped establish the nature of the farming activities on the premises. Mr. Zamberlin, a sign advertising expert, testified that there are many different ways to advertise, and that a

changeable message on a readerboard is an effective way of attracting attention to the sponsoring business, even when the message itself has nothing to do with the business. The State put on little testimony to contradict that of the defense, although it did establish that Mr. Hamilton has not taken business expense deductions for the sign or depreciated it for tax purposes, and that it was erected by nonfarm employees. The State seems to have hoped that the judge and his advisory jury would conclude, from the many photographs of the various sign messages introduced into evidence, that the purpose of the sign, or at least the primary purpose of the sign, was not to advertise the farm's activities. There is substantial evidence to support the findings that the sign accomplishes its intended purpose of advertising the Hamiltons' farm, contrary to the State's theory. We, therefore, are bound by those findings.

■■ Given that the portion of the sign used for commentary on political, social, religious, and other nonagrarian subjects is much larger than the space referring to Hamilton Farms and access to it from the freeway, that does not mean the *primary* purpose of the billboard is to disseminate Mr. Hamilton's political and religious views. And even if we were free to disagree with the trier of fact and were inclined to agree with the State's assessment of the sign's primary function, the statute fails to support the State's "primary purpose" argument. RCW 47.42.040(3) on its face allows, without qualification, "[s]igns advertising activities conducted on the property on which they are located". The record contains evidence that the attention–getting Uncle Sam readerboard is an effective means of advertising Hamilton Farms, whatever other purposes it may serve. We decline to add the "primary purpose" requirement to the statute. That is the responsibility of the legislature, if persuaded it should do so, rather than this court. The statute as it now reads is unambiguous and does not require resort to administrative interpretation. *Fecht v. Department of Social & Health Servs.*, 86 Wn.2d 109, 542 P.2d 780 (1975); *Allen v. Employment Security Dep't*, 83

Wn.2d 145, 148, 516 P.2d 1032 (1973). The evidence supports the court's finding that the sign legitimately and effectively advertises the Hamilton farm and is located on those premises; therefore, it is within the statutory authorization.

Moreover, if we were to agree that RCW 47.42.040(3) must be read to require that a sign's primary purpose be the advertisement of activities on the property, we would confront the First Amendment's guaranty of free speech. Neither the statute nor the implementing sections of the Washington Administrative Code, chapter 252–40 WAC, contain any guidelines for determining whether a sign's "primary purpose" is to advertise or serve some other objective. Is it to be based on a percentage of the sign's surface area clearly devoted to advertising? If, so, what percentage will qualify? Is it based on a comparison of the number and size of the sign's lettering devoted to advertising the activities versus some other purpose? Is it measured by the effectiveness of the advertising? The answers to these questions can only be extremely subjective.

The overall constitutionality of RCW 47.42.030 and .040 was recently upheld in *State v. Lotze,* 92 Wn.2d 52, 593 P.2d 811, *appeal dismissed,* 444 U.S. 921, 62 L. Ed. 2d 177, 100 S. Ct. 257 (1979). The *Lotze* court observed that the State's legitimate interest in advancing traffic safety and aesthetics justifies the regulation of billboards along the highway system in the face of First Amendment claims. Noting that commercial advertising now clearly is entitled to First Amendment protection, *Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 48 L. Ed. 2d 346, 96 S. Ct. 1817 (1976), our Supreme Court held it is constitutionally permissible for the Scenic Vistas Act to prohibit billboards visible from the highways which solely convey the owner's own political or social beliefs, while allowing the exceptional signs listed in RCW 47.42-.040(1)–(3). This distinction is permissible, according to *Lotze,* because political and cultural messages can be communicated effectively in other ways and in other places, but

on–premises business signs or realty "for sale" signs may be "the only available channel of communication to one trying to *identify,* rather than merely advertise his business or property." *Lotze,* at 59. To prohibit totally the latter class of signs found in RCW 47.42.040, therefore, may be unconstitutional. The court concluded its opinion by noting that it was approving a reasonable statutory regulation of the place and manner of political and social expression, but was not condoning a regulation of the *content* of speech.

The "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't v. Mosley,* 408 U.S. 92, 95, 33 L. Ed. 2d 212, 92 S. Ct. 2286 (1972). If, then, we were to accept the State's statutory interpretation that a sign, even though it advertises on–premises activity, must be pulled down if it *primarily* accomplishes the prohibited purpose of conveying political or religious views, we would confront the First Amendment in two ways: (1) Although *Lotze* would allow enforcement of the statute against signs with solely political and religious messages next to a highway, such a prohibition might be seen as overly broad to the extent it also forbade the protected function of advertising on–site activities. *See* L. Tribe, *American Constitutional Law,* § 12–24 (1978); *Grayned v. Rockford,* 408 U.S. 104, 114, 33 L. Ed. 2d 222, 92 S. Ct. 2294 (1972). (2) The law might also run afoul of the void–for–vagueness doctrine, *i.e.,* an advertiser of on–site activities, whose sign also serves another purpose, could never be sure whether the sign's allocation of space, content, or even design were such that the Highway Department could say it had crossed over the fuzzy line and begun "primarily" to serve that other purpose. *See* L. Tribe, *supra* at § 12–28; *Grayned v. Rockford, supra* at 108–09. This is where the extreme administrative subjectivity inherent in the State's construction of RCW 47.42-.040(3), alluded to above, comes in. It is difficult to conceive how the advertiser of an on–site activity, whose sign also conveys some other message, could be sure the sign "primarily" served one purpose and not the other—or whether

some enforcement official would agree with his own assess-
ment of the primary effect of the sign.

We have touched upon these First Amendment issues
only to show that, aside from the trial court's resolution of
the facts, the State's approach raises serious constitutional
questions that the *Lotze* court did not find it necessary to
address on the facts of that case. Because of the sufficiency
of the evidence to support the trial court, however, we do
not base our opinion upon the First Amendment.

The remaining issue in this appeal is whether the trial
court improperly restricted the State's efforts to obtain dis-
covery. Under its theory that the Hamiltons' sign did not
advertise on–premises activities, but was a forum for
expression of their political and religious beliefs, the State
sought to inspect the farm's business records to determine
exactly what activities were actually taking place there. The
State issued two subpoenas duces tecum requesting Mr.
Hamilton to bring the business records, first to a deposition
and later for examination during trial. He refused to
produce the records, and the trial court denied a pretrial
motion to compel discovery.

Defendants contend that the State did not properly pre-
serve this issue for review. The record shows, however, that
at trial the State reiterated its motion for production of the
business records to see if it had grounds to impeach Mr.
Hamilton's deposition and answers to interrogatories con-
cerning sales of the farm products, or if substantive evi-
dence about the farm's activities could be found in those
documents. The basis for the request was brought to the
court's attention, and the motion was again denied. This
was sufficient to preserve the issue for review. A formal
exception to the denial of the motion was unnecessary. CR
46.

In general, parties are permitted broad "discovery
regarding any matter, not privileged, which is relevant to
the subject matter" of the lawsuit. CR 26(b)(1); *Bushman
v. New Holland Div. of Sperry Rand Corp.*, 83 Wn.2d 429,
518 P.2d 1078 (1974). The trial judge possesses a broad

discretion to manage discovery in a fashion that will implement the philosophy of full disclosure of relevant information and at the same time afford protection against harmful side effects. 4 J. Moore & J. Lucas, *Moore's Federal Practice* § 26.67 (2d ed. 1979). To that end, the court can issue protective orders regulating the extent and manner of discovery. CR 26(c).

The State sought access to the farm's business records primarily to establish a possible basis for impeaching Mr. Hamilton's statements about the farming activities and sales of products; the records also could have provided evidence of exactly what activities were taking place on the farm. Although a split of authority exists whether discovery can be compelled to yield material solely for impeachment purposes, Annot., 18 A.L.R.3d 922, § 2 (1968), we need not decide that issue in this case. Clearly, some of the records were direct evidence of the farm's activities and were relevant to the subject matter of the action, *i.e.,* does the sign advertise the farm's true activities? The State should have been allowed to verify Mr. Hamilton's word that he was carrying on farming activities, including the sale of Angus and "springer" cattle, as indicated by the sign. Therefore, the judge appears to have improperly limited access to relevant, unprivileged information within a party's control.

The trial judge was understandably concerned that the State's request would result in complete access to the farm's records, most of which could easily be irrelevant to the litigation over a single sign on the premises. To alleviate the possibility of undue inconvenience or harassment of defendants, the State would have agreed to the court's inspection of the records and weeding out of irrelevant material. As it was, the scope of inquiry actually undertaken by deposition and interrogatory required defendants to make some review of their financial records, and the State's request simply would have required them to submit check stubs, tax returns, sales receipts and the like to the court for preliminary review. The additional inconvenience

would not have been so great as to amount to harassment, in our opinion.

■ Our conclusion that the trial court improperly curtailed discovery does not, however, require reversal of the judgment unless it was prejudicial. *See Weber v. Biddle,* 72 Wn.2d 22, 29–30, 431 P.2d 705 (1967).

It is obvious from all the evidence that the farm is a genuine means for the Hamiltons to earn their livelihood, and that they raise and sell farm products including cattle, as advertised. We note that some of the answers elicited by the State, such as Mr. Hamilton's admission he did not take depreciation or business expense deductions for the sign, favored the State's position that the sign was insufficiently related to the farm's business. And although its discovery was curtailed too far, the State did succeed in establishing at trial that the sign serves a purpose, that of conveying defendants' political and religious views, which is unrelated to the farm's activities. But inasmuch as the evidence at trial uniformly shows the farm to be in fact a working, producing farm, and the State has never even hinted that it is only a facade for some other purpose, *e.g.,* fomenting political activity, we see little prejudice to the State in the denial of access to the farm's sales volume records. The State does not contend the farm is not really a farm; therefore, the volume of sales of cattle or grain loses significance with respect to the real issue. Also, in view of our rejection of the "primary purpose" standard, the records sought likewise lose significance with respect to the real issue.

As we read the statute, the question was, and is, not whether the farm makes many or relatively few sales, or what defendants' primary motive was for erecting the sign. As discussed above, the real question under the statute is not even whether the sign's "primary purpose," however that might be measured, is to advertise the on–site activity. The real question is factual: Are activities conducted on the premises which are advertised by the sign? The trial court, both judge and jury, found upon substantial evidence that

938

the sign actually and effectively serves that purpose. Given that the evidence showed usual farming activities at the site, we fail to see how greater access by the State to check stubs and sales receipts could have changed the outcome.

The judgment is affirmed.

PETRIE and SOULE, JJ., concur.

Reconsideration denied January 17, 1980.

Review denied by Supreme Court April 1, 1980.